### BLAIR *v.* CITY OF CHICAGO.

### NORTH CHICAGO CITY RAILWAY COMPANY *v.* BLAIR.

### CITY OF CHICAGO *v.* FETZER.

### BLAIR *v.* CITY OF CHICAGO.

### CHICAGO WEST DIVISION RAILWAY COMPANY *v.* BLAIR.

### CITY OF CHICAGO *v.* FETZER.

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.

Nos. 331, 332, 333, 334. 335 and 336. Argued January 11, 12, 15, 1906.—Decision announced March 12, 1906.—Opinion filed April 2, 1906.

Where notes are made by a corporation payable to the order of its own treasurer, a citizen of the same State, as a matter of convenience and custom, and indorsed and delivered by him to a *bona fide* holder who, a citizen of a different State, furnishes the money·represented by the note directly to the corporation, the treasurer is not in fact an assignee of the note within the meaning of the act of August 13, 1888, 25 Stat. 433, and suit may be brought by such holder in the Circuit Court of the United States having jurisdiction of the parties, notwithstanding such diversity does not exist as to the treasurer first indorsing the note. *Falk* v. *Moebs*, 127 U. S. 597; *Holmes* v. *Goldsmith*, 147 U. S. 150.

Where there is a proper cause of action and diverse citizenship, jurisdiction of the Federal courts exists, and the motive of the creditor who desires to litigate in that forum is immaterial, and does not affect the jurisdiction; nor is such jurisdiction if it actually exists, affected by the fact that a

receivership was in view when judgments were entered. *South Dakota v. North Carolina*, 192 U. S. 286.

Where, as in this case, the attitude and claims of the municipality cast a cloud upon the title to property consisting largely of franchises in the hands of receivers and to be administered under orders of the court, the receivers may, with the authority of the court, proceed by ancillary bill to protect the jurisdiction and right to administer the property, and to determine the validity of claims of parties which cast a cloud upon such franchises and in such a case it is proper to grant an injunction until the rights of the parties can be determined.

Whether a corporation having a limited and definite capacity to purchase and hold real estate has exceeded those limits concerns only the State within whose jurisdiction the property is situated; the question cannot, unless the statute expressly or by necessary implication authorizes it, be raised collaterally by private persons. *Fritts v. Palmer*, 132 U. S. 282.

The generality of the title of a state statute does not invalidate it under a provision of the constitution of the State that private and local laws shall only embrace one subject which shall be expressed in the title, so long as the title is comprehensive enough to reasonably include within the general subject or the subordinate branches thereof, the several objects which the statute seeks to effect, and does not cover legislation incongruous in itself and which by no fair intendment can be included as having any necessary and proper connection. *Montclair v. Ramsdell*, 107 U. S. 147.

Although decisions of the highest court of a State are not binding on this court in determining whether a contract was made by legislative action of that State which is entitled to protection under the impairment of obligation clause of the Federal Constitution, it will consider decisions of that court on the point in question.

One asserting private rights in public property under grants of franchises must show that they have been conferred in plain terms, for nothing passes by the grant except it be clearly stated or necessarily implied. Legislative grants of franchises which are in any way ambiguous as to whether granted for a longer or a shorter period are to be construed strictly against the grantee.

As a rule of construction a statute amended is to be understood in the same sense exactly as if it had read from the beginning as it does amended.

Although a corporation be organized under a charter for a limited period it may receive a grant inuring to the benefit of its lawful successors for a period beyond its corporate life, but the right granted must be construed with reference to the system of which it is a part and where that general system is for a limited period a single ordinance, not naming a specific term, will not be construed as granting a franchise in perpetuity.

A declaration in the title of state statutes that they concern horse railways, where it is apparent that these terms were intended to indicate street railways as distinguished from steam railways, will not, because of a constitutional provision that the object of the statute must be expressed in the title, prevent the city from exercising its powers under the statute in

such manner as to authorize the use of other power such as cable or electricity.

The repeal of a state statute authorizing every street railway to be operated by such animal, electric or other power as the municipal authorities may have granted would not destroy its effect to ratify contracts in existence when it was passed.

Where a state statute requires the consent of a municipal officer to authorize the extension of a street railway the abolition of that office does not authorize the extension without any official consent; and where the consent of municipal authorities is required for franchises relating to special localities by a statute, and subsequently a general act limits the time for which any such franchise can be granted in any city or village, the consent given will be presumed, in the absence of any period specified not to be in perpetuity, but for the period as so limited.

Under the law of Illinois municipal corporations have a fee simple in, and exclusive control over, the streets, and the municipal authorities may do anything with, or allow any use of, the streets not incompatible with the ends for which streets are established, and it is a legitimate use of a street to allow a street railroad track to be laid down in it.

Applying the foregoing principles to the construction and effect of the various acts of the legislature of the State of Illinois, and of the ordinances of the municipal authorities of the city of Chicago and adjacent towns, in regard to the franchises of the several street railway companies owned and controlled by the Chicago Union Traction Company, and the receivers thereof *held*, that [1]

1. The Circuit Court of the United States for the Northern District of Illinois had jurisdiction to render the judgments against the Chicago Union Traction Company, the North Chicago Street Railroad Company and the West Chicago Street Railroad Company set up in the bills afterwards filed for the appointment of receivers.

2. The proceedings for the appointment of receivers were not shown to be collusive and fraudulent, and the court had jurisdiction to entertain the bills and appoint the receivers and put them in possession of the property of the railway companies.

3. The ancillary bills filed by the receivers were maintainable in aid of the court's jurisdiction to settle controversies as to the property which was to be administered and disposed of under the orders and decree of the court.

4. The acts of 1859, 1861 and 1865 were not unconstitutional under the constitution of Illinois of 1848 in force when the same were passed.

5. The act of February 6, 1865, amending the act of February 14, 1859, had the effect to extend the corporate lives of the Chicago City Railway Company, the North Chicago City Railway Company and the Chicago West Division Railway Company, for the term of ninety-nine years. It

---

[1] The numbered paragraphs are as stated by MR. JUSTICE DAY in announcing the decision and judgment of the court.

affirmed the contracts with the city prescribing rights and privileges in the streets of Chicago in all respects as theretofore made, including time limitations as contained in the ordinances previously passed. It recognized and continued in force the right of the city and the companies to make contracts for the use of the streets upon terms and conditions, including the time of occupancy, as might be agreed upon between the council and the corporations. .

6. Corporate privileges can only be held to be granted as against public rights, when conferred in plain and explicit terms. The ambiguous phrase in the act of 1865, "during the life hereof," did not operate to extend existing contracts for the term of ninety-nine years or limit the right of the city to make future contracts with the companies covering shorter periods.

7. The amending act of 1865 had reference to the North Chicago City Railway Company as well as the corporations specifically named in the first sections of the acts of 1859 and 1861.

8. The ordinances of May 23, 1859, granting rights and privileges in certain streets to the Chicago City Railway Company and the North Chicago City Railway Company, respectively, are radically different. The grant to the former company for the south and west divisions of the city is during all the term specified in the act of February 14, 1859, which act expressly ratified the ordinance of 1858, granting the right to use the streets therein named for the term of twenty-five years and until the city shall purchase and pay for the same as set forth in said ordinance. On the north side the term granted is for twenty-five years "and no longer." The privileges conferred upon the Chicago City Railway Company and its grantee were confirmed, as made, by the act of 1865, with the effect to continue the right of the companies to occupy the streets named in the ordinances of 1858, May 23, 1859, and similar ordinances, for the term of twenty-five years and until the city shall elect to purchase and pay for the property of said railway companies. On the north side, no such right exists to remain in the use of the streets until purchase by the city.

9. Whatever rights existed in the streets, were not lost to the companies by the acceptance of the ordinances granting a change from animal to cable or electric power in the operation of the railways.

10. The grants in the town of Jefferson, having been made after the acceptance of the Cities and Villages Act, are limited to the term of twenty years.

11. The grants by the supervisor of Lake View are not in perpetuity, as the Lake View road was but an extension of the North Side system, which was expressly limited in the duration of its grants to the term of twenty-five years. No intention will be presumed to make an extension of this part beyond the life of the grant to the main lines of the North Side road.

12. The grants by the trustees of Lake View will not extend beyond the life of the corporation making them and upon the annexation of the town of Lake View to Chicago, the further right to use the streets must be de-

rived from grants by the council of that city under power conferred by the Cities and Villages Act.

'The decree is reversed and cause remanded for further proceedings in accordance with the views herein expressed.

THESE are appeals from two decrees of the Circuit Court of the United States for the Northern District of Illinois. The origin of the cases dates from April 22, 1903, when the Guaranty Trust Company of New York, a corporation and citizen of that State, filed three suits in the Circuit Court of the United States for the Northern District of Illinois against the Chicago Union Traction Company, the North Chicago Street Railroad Company, and the West Chicago Street Railroad Company, corporations and citizens of the State of Illinois. On the day the declaration was filed the general issue was joined, the jury waived, and upon trial judgment was rendered against the respective defendants for $318,690.66, $565,052.66, and $270,440. Executions having been awarded and returned no property found, bills were filed by the Guaranty Trust Company, and receivers appointed for the property of each and all of those companies. Under the order of the court of July 18, 1903, the receivers filed two ancillary bills, one against the City of Chicago, the Chicago West Division Railway Company, the Chicago Union Traction Company and the West Chicago Street Railroad Company; the other, against the City of Chicago, the Chicago Union Traction Company, the North Chicago Street Railroad Company and the North Chicago City Railway Company. They were afterwards amended by leave of the court. These bills state, among other things (having reference now to the West Side case), that, as receivers and under the order of the court, the complainants were in possession of the system of street railroads; that the property included the rights, privileges and franchises originally granted to the Chicago West Division Railway Company by the State of Illinois; that on October 20, 1887, the Chicago West Division Railway Company leased the property to the West Chicago Street Railroad Company for the full term of nine

hundred and ninety-nine years; that on June 1, 1889, that company transferred and conveyed to the Chicago Union Traction Company all its property, franchises and rights, which were taken possession of by that company and were possessed and enjoyed by it with the consent of the city council, until the appointment of complainants as receivers; that since the appointment they have been directed by the court to make expenditures of about $580,000 in procuring new equipment; for that purpose it was necessary to issue receivers' certificates to borrow money, which they alleged they were unable to do, because of the hostile acts of the city of Chicago, its mayor, its council committees and representatives, which amounted to an impairment of the contract rights and franchises secured to the complainants and granted by the acts of the general assembly of Illinois, passed February 14, 1859, and February 6, 1865. They received a notice from the superintendent of streets, dated July 16, 1903, addressed to them as receivers, and stating that all permits issued to the Chicago Union Traction Company to do work and make repairs upon the streets, alleys or public places in the city of Chicago were to be revoked on July 30, 1903. The bill sets out a large number of ordinances of the city and acts of the State of Illinois, under which acts, it was alleged, privileges and franchises were granted on fifty-six of the streets of the city, for the period of ninety-nine years from February 14, 1859.

It was averred that the city denies any contract right with the complainants under and by virtue of the said laws and ordinances, and, for the purpose of coercing the railroad companies to surrender their franchises, received from the State, asserts and claims that the act of 1865 is unconstitutional and void; that if valid, it only operates to the extent of such lines as were authorized and consented to before its passage; that if valid, the railroads could only operate their lines by animal power; that by force of the ordinance of July 30, 1883, the right to operate lines constructed prior thereto was absolutely limited to July 30, 1903, and that thereafter the railroad com-

pany would be a trespasser upon the streets of the city; that, by messages and official declarations of the mayor and council of the defendant city, it was given out that, unless the railroad company would surrender its franchises and rights to occupy the streets of the city, the city would oust the railroad company therefrom and pass an ordinance granting the right to operate street railways upon the streets, now occupied by the railroad company, to other persons or corporations. That unless an injunction is granted, the city will, after July 30, 1903, proceed by declaration of forfeiture or otherwise to interfere with and prevent the occupation and enjoyment of the fifty-six railway routes described in the bill. That as to the street railroads where ordinances provided for possession until the city shall purchase the lines, the city has never made an offer to purchase and seeks to force a surrender of the franchises and privileges, and to compel the railroad company to accept a twenty years' license, at an oppressive and ruinous annual rental. That if the claim and contentions of the city are sustained, the entire system of the railroad company will be destroyed and its charter rights illegally confiscated.

The prayer for relief is that the Chicago West Division Railway Company be decreed to be vested by the State of Illinois with the franchises and right to own, maintain and operate fifty-six street railway routes, described in the bill, until 1960 and until such time thereafter as the city shall purchase the lines and pay for them in cash at their then appraised value, according to the terms of the ordinance contract; that it be decreed that the claim of the city of Chicago that the rights of the companies will expire on July 30, 1903, impairs the obligation of the charter subsisting between the State of Illinois and the said companies, and constitutes an unlawful taking of the rights and property of the company without compensation, and an unlawful interference with the property in the custody of the court; that the charter rights of the companies to maintain, operate and enjoy the lines described in the bill until the

year 1960, and thereafter until the city purchases the same, be established and quieted as against the hostile claims of the city, and that such claims be declared and decreed unconstitutional, contrary to law and exist as clouds upon the title of the company, and for a perpetual injunction against the city from asserting the claims aforesaid or interfering with the possession, occupation and enjoyment of the railroad's property, except in the proper exercise of its police power, until the lawful determination of the charter rights.

The bill in the North Chicago case is substantially the same. It avers that the property vested in the receivers in the North Division of the city is about one hundred miles of street railroad and the franchises and privileges thereunto belonging; that on May 24, 1886, the North Chicago City Railway Company leased to the North Chicago Street Railroad Company for the term of nine hundred and ninety-nine years all its property, franchises and rights, except the right to exist as a corporation. That on June 1, 1899, the North Chicago Street Railroad Company leased and conveyed the property, for the full life of the lessor corporation, to the Chicago Union Traction Company; that the traction company entered into possession of the property and continued to use the same until the appointment of the receivers named therein.

The city answered and set up among other things that the suits wherein the receivers were appointed were collusive and in pursuance of a scheme concocted by the West Chicago Street Railroad Company, the North Chicago Street Railroad Company, the Chicago Union Traction Company and the Guaranty Trust Company of New York for the purpose of conferring jurisdiction upon the Circuit Court of the United States on the ground of diverse citizenship; that the Guaranty Trust Company was not a *bona fide* owner of the judgment upon which the suits were brought; and that the evidences of indebtedness upon which that company brought suit and obtained judgment as a colorable basis for the allowance of creditors' bills and appointment of receivers were not in fact owned by the Guar-

anty Trust Company, but were owned by divers persons and corporations of the State of Illinois.

The city denies that the city council passed any ordinances or resolutions that constitute an impairment of the contract rights of the complainants, granted under the acts of the general assembly of the State of Illinois, February 14, 1859, and February 6, 1865, or the ordinances of the city, and denies that it has ever threatened interference with any lawful rights, franchises or privileges held by the complainants. It admits that its superintendent of streets sent a written notice to the complainants as alleged in the bill but without authority from the defendant, and that on July 21, 1903, the same was rescinded and recalled.

The answer then sets up the claims of the city, concerning the legislative acts and ordinances pleaded in the bill, admits the passage or attempted passage thereof, but denies that the same has resulted in investing the railroad companies with a franchise from the State, to maintain and operate the system of railroads for ninety-nine years, and avers that the rights under certain of the ordinances set up in the bill expire on July 30, 1903. Defendant denies that it unlawfully or oppressively injured the lawful rights of the company; admits that it has contended and now contends that the alleged act of 1865 is unconstitutional and void as construed by the company; that the said act, when properly construed, did not operate to extend the duration of time beyond that fixed in various ordinances respectively relating to said lines; that the said companies have no right to operate street railway lines by other than animal power; and that the time for operation of certain of the lines existing under ordinances passed prior to July 30, 1883, expired on July 30, 1903, by reason of the time limits prescribed in said ordinances, as extended by the ordinance of July 30, 1883, and by reason of the limitation in the power of the city by the City and Village Law of the State of Illinois, in force July 1, 1872. It avers that it has never claimed or asserted that the time for the operation of lines constructed

under ordinances passed prior to July 30, 1883, absolutely ceased and determined, but on the contrary has recognized and conceded the existence of the purchase clause contained in certain of said ordinances as affecting the time limitations therein, and has endeavored to procure proper fiscal legislation by the general assembly of the State, which would enable the city to avail itself of said ordinance provisions with reference to purchase, and has frequently proposed and desired negotiations with the companies to provide new ordinances for the purchase by the defendant of the tangible property of said companies. The answer denies the allegations of the bill as to unlawful threats and compulsions, but admits that it does intend to enforce its rights in its streets against the unlawful claims of the companies, and admits that, unless restrained by injunction, it will proceed by every proper and lawful method to enforce its rights in its streets as set up in the answer, and to procure necessary street railway facilities for the citizens of Chicago, and to prevent the companies from unlawful usurpation of rights in the streets or from continuing to occupy the same after the right so to do has ceased and determined. It admits that as early as 1883 a serious difference as to the nature and extent of the legal and contract rights of the street railway companies in certain of the streets of the city arose between the companies and defendant. It sets up the messages of the mayor and copies of the various resolutions of the council with regard to opening negotiations with the companies for the ascertainment of their rights and those of the city.

The case having been tried, the Circuit Court rendered a decree holding that the legislative acts of 1859, 1861 and 1865 constituted a grant to the companies to use the streets of the city to be designated by the council, but that the franchise to use the streets was a grant from the State; that the acts of 1859, 1861, as amended in 1865, extended the franchises of the companies for ninety-nine years, the extended life of the corporation; that the constitution of Illinois of 1870 prohibited the further creation of corporations by special laws, and de-

-creed that the general assembly should not grant the right to construct any street railways in the city without acquiring the consent of .the local authorities then having control over the streets; that the Cities and Villages Act of 1872 empowered cities organized under that act to permit, regulate or prohibit the locating, laying or constructing of tracks of horse railroads in any street, alley or public place, but such permission was limited to a period not to exceed twenty years; that the acts of 1859, 1861, as amended in 1865, did not constitute a grant by the legislature of.streets which were authorized to be used and occupied by the city after it adopted and elected to be governed by the City and Village Act, and that after date of May 3, 1875, as to such streets, the street railway companies' rights were regulated by the city ordinances affecting the same; that the act of 1859, under the tenth section of which the North Chicago City Railway Company was incorporated, amended by the act of February 21, 1865, extended the life of the corporation for ninety-nine years; and held that said amendment applied not only to the Chicago City Railway Company, but as well to the rights conferred by the act of 1859 on the North Chicago City Railway Company. The case is reported in 132 Fed. Rep. 848.

Pertinent parts of the ordinance of August 16, 1858, the acts of February 14, 1859, February 21, 1861, and February 6, 1865, are given in the margin.[1]

---

[1] Ordinance of August 16, 1858.

An ordinance authorizing the construction and operation of certain horse railways in the streets of the city of Chicago (passed August 16, 1858).
*Be it ordained by the common council of the city of Chicago :*

SECTION 1. That there is hereby granted to Henry Fuller, Franklin Parmalee and Liberty Bigelow, and such other persons as may hereafter become associated with them, and to their executors, administrators and assigns, permission and authority and consent of the common council to lay a single or double track for a railway, with all necessary and convenient tracks for turn-outs, side tracks and switches, in and along the course of certain streets in the city of Chicago hereinafter mentioned, and to operate railway cars and carriages thereon in the manner and for the time and upon

*Mr. Clarence S. Darrow, Mr. Glenn Edward Plumb* and *Mr. Edgar B. Tolman,* with whom *Mr. James Hamilton Lewis* was on the brief, for the city of Chicago:

The Circuit Court had no jurisdiction to entertain the so-

the conditions hereinafter prescribed; provided, that said tracks shall not be laid within twelve feet of the sidewalks upon any of the streets.

SEC. 2. That said parties are hereby authorized to lay a single or double track for a railway in and along the course of the following streets in said city, and extending the same as follows: Commencing on State street, at the south side of Lake street; thence south to the present city limits. Also, commencing on State street, at the junction of Ringgold place; thence on Ringgold place to Cottage Grove avenue, thence on Cottage Grove avenue to the present limits of the city of Chicago. Also, commencing on State street, at the junction of the Archer road; thence along the said Archer road to the present limits of the city. Also, commencing on State street, at the intersection of Madison street; and extending west along said Madison street to the present city limits.

SEC. 3. The cars to be used upon said tracks shall be operated with animal power only; and said railways shall not connect with any other railroad on which other power is used, and no railway car or carriage used upon any other railroad in this State shall be used or passed upon said tracks.

SEC. 4. The said tracks and railways shall be used for no other purpose than to transport passengers and their ordinary baggage, and the cars or carriages used for that purpose shall be of the best style and class in use on such railways. The common council shall have power at all times to make such regulations as to the rate of speed and time of running said cars or carriages as the public safety and convenience may require.

SEC. 5. The tracks of said railways shall not be elevated above the surface of the street; shall be laid with modern improved rails, and shall be so laid that carriages and other vehicles can easily and freely cross said tracks at any and all points, and in any and all directions, without obstruction.

SEC. 6. The rate of fare for any distance shall not exceed five cents, except when cars or carriages shall be chartered for a specific purpose.

SEC. 7. The said parties, their associates and successors, shall pay one-third of the cost of grading, paving, macadamizing, filling or planking on the streets or parts of streets on which they shall construct their said railways, and in the respects last mentioned shall keep such portion of the respective streets as shall be occupied by their said railways, or either of them, in good repair and condition during the whole time that the privileges hereby granted to said parties shall extend, in accordance with whatever orders may be passed in that behalf by the common council of the said city of Chicago; and said parties shall be liable for all legal or consequential damages which may be sustained by any person by reason of the care-

called ancillary bills of complaint herein. The notes originally
sued upon were payable to a citizen of Illinois and by him in-
dorsed to the Guaranty Trust Company of New York and af-
forded the court no jurisdiction to enter the original judgments

---

lessness, neglect or misconduct of any agent or servant of said parties, in
the course of their employment in the construction or the use of the said
tracks or railways, and said parties shall moveover pay to the property
owners on any street so used by them as aforesaid for their said railways,
which has since the first day of January, A. D. 1858, been paved, macad-
amized or planked, and at any time between said date last mentioned and
the time of going into the occupation of either of said respective streets
with the said railway by said parties, their associates or successors, may
be paved, macadamized or planked, one-third of the reasonable cost and
expense thereof so paid by said property owners, respectively.

Sec. 8. The rights and privileges granted to said parties by virtue of
this ordinance shall be forfeited to the city of Chicago unless the construc-
tion of one of said railways shall be commenced on or before the first day
of November, A. D. 1858; and unless the said railway commencing on the
south side of Lake street and extending to Ringgold place shall be fully
completed and ready for use on or before the fifteenth day of October,
A. D. 1859; and the Madison street railway, commencing at the inter-
section of State street, and running on said Madison street to the city
limits, completed and ready for use on or before the fifteenth day of Octo-
ber, A. D. 1860; and said railway from Ringgold place to Cottage Grove
avenue, and along the same to the city limits, by the first day of January,
A. D. 1861, and all the remaining railways hereinbefore mentioned, on or
before the first day of January, A. D. 1863, the said railways, together with
all improvements made upon the same, shall be forfeited to said city of
Chicago, unless the common council of said city shall grant to said parties
a further extension of time; provided, that if said parties are delayed by
the order or injunction of any court, the time of such delay shall be ex-
cluded, and the same time, in addition to the periods above prescribed,
shall be allowed for the completion of said railways as that during which
they may be so delayed.

Sec. 9. If the said parties, their associates or successors, shall hereafter
become incorporated, the rights and privileges granted to them by virtue
of this ordinance shall extend to such corporation for the time and upon
the conditions herein prescribed, and when such act of incorporation shall
have been maintained, such corporation shall have all the rights and privi-
leges hereby granted as the successors of said parties, without further
action of the common council.

Sec. 10. The right to operate said railways shall extend to the full time
of twenty-five years from the passage hereof, and at the expiration of said
time the parties operating said railways shall be entitled to enjoy all of
said privileges until the common council shall elect, by order for that pur-

on which all the proceedings were founded. Illinois Revised Statutes, ch. 98, §§ 3, 4, 5, 8; *Hately* v. *Pike,* 162 Illinois, 241; United States Revised Statutes, § 629; *Thompson* v. *Elton,* 100 Fed. Rep. 145; *Wilson* v. *Knox County,* 43 Fed. Rep.

---

pose, to purchase said tracks of said railways, cars, carriages, station houses, station grounds, depot grounds, furniture and implements of every kind and description, used in the construction or operation of said railways, or any of the appurtenances in and about the same, and pay for the same in the manner hereinafter mentioned.

SEC. 11. Such order shall fix the time when said city of Chicago will take such railways and other property before mentioned, which shall not be less than six months after the passage of said order, and at the time of taking said railways and other property before mentioned the city of Chicago shall pay to the parties operating the same a sum of money to be ascertained by three commissioners; to be appointed for that purpose, as follows: One to be chosen from the disinterested freeholders of Cook County by the said common council, one in like manner by the said parties, their associates and successors, and the two persons so chosen to choose the third from said freeholders.

SEC. 12. All rights heretofore vested in the Board of Water Commissioners and Sewerage Commissioners, or other corporations, are not to be impaired or affected by this ordinance, but the rights and privileges hereby granted are subject thereto.

SEC. 13. The said Henry Fuller, Franklin Parmalee and Liberty Bigelow shall enter into a good and sufficient bond with the city of Chicago, in the penal sum of twenty-five thousand dollars, for the faithful performance of all the terms and conditions herein contained in this ordinance, and that said railways herein mentioned shall be completed at the times and manner herein stated, unless delayed by the order or injunction of some court having jurisdiction of such matters from so completing the same, and until such bond shall be so executed by said parties this ordinance shall have no force or effect whatever.

SEC. 14. All ordinances or parts of ordinances heretofore passed, respecting the subject matter of this ordinance (except to which this is an amendment), or in conflict with this ordinance or that to which the same is an amendment, are hereby repealed.

### Act of February 14, 1859.

Act to promote the construction of horse railways in the city of Chicago.

SECTION 1. *Be it enacted by the people of the State of Illinois, represented in the General Assembly,* That Franklin Parmalee, Liberty Bigelow, Henry Fuller and David A. Gage, and their successors, be and they are hereby created and constituted a body corporate and politic by the name of "The Chicago City Railway Company" for the term of twenty-five years, with

481; *Skinner* v. *Barr*, ·77 Fed. Rep. ·816; *City of New Orleans* v. *Benjamin*, 153 U. S. 411; *Utah,·Nevada Co.* v. *Delamar*, 133 Fed. Rep. 113; *Mexican Nat'l R. R. Co.* v. *Davidson*, 157 U. S. 201, 208; *King's Bridge Co.* v. *Otoe Co.*, 120 U. S. 225; *Parker*

all ·the powers and authority · incident to corporations, for the purposes hereinafter mentioned.

Sec. 2. The said corporation is hereby authorized and empowered to construct, maintain and operate a single or double track railway, with all necessary and convenient tracks for turn-outs, side tracks and appendages in the city of Chicago, and in, on, over and along such street or streets, highway or highways, bridge or bridges, river or rivers, within the present or future. limits of the South or West Divisions of the city of Chicago, as the common council of said city have authorized said corporators or any of ·them or shall authorize said corporation so to do, in such manner and upon such terms and condition, and with such rights and privileges as ·the said common council has or may have contracted with said parties or any · or either of them prescribe, but said corporation, shall not be liable for the loss of any baggage carried on said railways kept in and under the care of its owner, his servant or agent.

Sec. 3. [As to capital stock.]

Sec. 4. [As to directors, etc.]

Sec. 5. The said corporation is hereby authorized to extend the said several railways herein authorized to be built, in the manner aforesaid to any point or points within the county of Cook in this State; and to enable said corporation to construct any or all the railways therein authorized, or their appendages, the said corporation is hereby vested with power to take and apply private property for the purposes and in the manner prescribed by an act entitled "An act to amend the law condemning right of way for purposes of internal improvement," approved June 22, 1852, and the several acts amendatory thereof, and may exercise all· the powers conferred upon railroad corporations by the twenty-fifth and twenty-sixth sections of "An act to provide for a general system of railroad incorporations," approved November 5, 1849, ascertaining and making recompense for all damages sustained agreeably to the provisions of the act hereinbefore first mentioned.

Sec. 6. The said corporation is hereby authorized, with the assent of the supervisor of any township, to lay down and maintain the said railway or railways in, upon, over and along any common highway in said township, but in such manner as not to obstruct the common travel of the public over the same. In all cases where vehicles shall meet the cars or carriages of said railway, either in the city or country, said vehicle shall give way to the cars or carriages on the railway.

Sec. 7. All of· the rights and privileges granted or intended so to be to said Franklin Parmalee, Liberty Bigelow, Henry Fuller, and their associates, in and by the ordinances of the common council and the amend-

v. *Ormsby,* 141 U. S. 81; *Pope* v. *Lousiville, New Albany &c. R. R. Co.,* 173 U. S. 577.

The bills should have been dismissed by the court for lack of jurisdiction, upon an examination of the record, which

---

ments thereto, are hereby in all things affirmed and shall pass to and become vested in the corporation hereby created.

SEC. 8. Nothing herein contained shall authorize the construction of more than a single track with the necessary turn-outs, which shall only be at street crossings upon State street between Madison and Twelfth streets, except by the consent of the owners of two-thirds of the property, in lineal measurement, lying upon said State street between Madison and Twelfth streets aforesaid, nor shall anything herein contained be ·construed to authorize the company hereby incorporated to permit the cars of any other railroad company whatever, propelled by steam, to be run along or upon the railway of the company hereby incorporated.

SEC. 9. The said company hereby incorporated, shall, within two years from the passage of this act, erect, maintain and operate two railways, one from Lake street to the southern boundary of the city and one from the south branch of the Chicago River, on Madison street, to the western boundary of said city, and upon failure to do so this act and all the privileges and franchises hereby conferred shall cease and determine.

SEC. 10. All the grants, powers, privileges, immunities and franchises conferred upon, and all duties and obligations required of Franklin Parmalee, Liberty Bigelow, Henry Fuller and David A. Gage by this act for the South and West Divisions of the city of Chicago and the county of Cook, are hereby conferred upon and required of William B. Ogden, John B. Turner, Charles V. Dyer, James H. Rees and Valentine C. Turner, by the name of "The North Chicago City Railway Company" for the North Division of said city, and said county of Cook, as fully and effectually to all intents and purposes as if they had been by a separate act incorporated, with all of said grants, powers, privileges, immunities and franchises, conferred upon them, and all of said duties and obligations imposed upon them, and the said last named corporation, may take, hold, mortgage and convey real estate.

SEC. 11. This act shall be deemed a public act and noticed by all courts as such without pleading, and shall take effect from its passage.

### Act of February 21, 1861.

An act to authorize the extension of horse railways in the City of Chicago.

SECTION 1. *Be it enacted by the people of the State of Illinois represented in the General Assembly,* That Edward P. Ward, William K. McAllister, Samuel B. Walker, James L. Wilson, Charles B. Brown, Nathaniel P. Wilder, and their successors, be and they are hereby created and constituted a body corporate and politic, by the name of "The Chicago West Division

showed upon its face collusion and the attempted imposition of a fraud upon the court. *Sage* v. *Memphis, Little Rock R. R. Co.*, 18 Fed. Rep. 571; *S. C.*, 125 U. S. 362; *Little* v. *Bowers,* 134 U. S. 547; *Industrial & Min. Guar. Co.* v. *Electric Supply*

Railway Company," for the term of twenty-five years, with all the powers and authority pertaining to corporations for like purposes.

SEC. 2. The said corporation shall possess all the powers conferred by and be subject to all the provisions contained in the second, third, fifth and sixth sections of an act entitled "An act to promote the construction of horse railways in the city of Chicago," approved February 14, 1859: *Provided,* that nothing herein contained shall be so construed as to in any manner invalidate or injuriously affect any of the rights of either of the corporations created by said act, or to authorize the corporation hereby created to construct or use any railway track in the North Division of Chicago, except by the written consent of the North Chicago City Railway Company: *And, further, provided,* the consent of the owners of two-thirds of the property, by lineal measure, fronting upon the streets through which said railway shall pass, shall be obtained.

SEC. 3. [As to directors, etc.]

SEC. 4. The corporation hereby created is authorized to purchase, hold and convey real or personal estate; to mortgage or lease its franchises and property; to acquire, unite and exercise any of the powers, franchises, privileges or immunities conferred upon the Chicago City Railway Company by the act aforesaid, or any ordinance of the common council of said city, upon such terms and conditions as may by contract between the said railway corporations, be prescribed; and the consent of the board of directors of the said Chicago City Railway Company, manifested in writing, shall be a condition precedent to the corporation hereby created exercising the powers or any of them conferred upon it by the second section of the act aforesaid, as to any street of said South and West Divisions of Chicago, in which the said Chicago City Railway Company has acquired the right of laying down its track: *Provided,* that upon obtaining such contract or consent as aforesaid, this corporation shall thereupon and thereby become entitled, as to the streets last above mentioned and no others, to use the same according to the provisions of said contract and ordinances aforesaid, anything herein contained to the contrary notwithstanding.

SEC. 5. [As to obstructing cars, etc.]

Act of February 6, 1865.

An act concerning horse railways in the city of Chicago.

SECTION. 1. *Be it enacted by the people of the State of Illinois, represented in the General Assembly,* That the first section of an act of said General Assembly, entitled "An act to promote the construction of horse railways in the city of Chicago," approved February 14, 1859, and the first section of a certain other act of said General Assembly, entitled "An act to au-

*Co.*, 58 Fed. Rep. 732; *Put-in-Bay Waterworks ·Co.* v. *Ryan,*
181 U. S. 409; *Farmington* v. *Pillsbury,* 144 U. S. 138; *Ber-*
*nard's Township* v. *Stebbins,* 109 U. S. 341, 354; 23 Am. &
Eng. Ency. of Law, 2d ed. p. 1040; *Robinson* v. *Anderson,* 121

thorize the extension of horse railways in the city of Chicago," approved
February 21, 1861, be and the same are hereby so amended as that all
the words in said respective sections after the word "company" therein,
respectively, shall be and read as follows, viz: "for ninety-nine years,
with all the powers and authority hereinafter expressed, or pertaining to
corporations for the purposes hereafter mentioned.

SEC. 2. That the second section of the act first above referred to by its
title, and which section is included in and made a part of the act secondly
above referred to by the title thereof, be and the same is hereby as to both
of said acts so amended as to read as follows, viz: "The said corporation
is hereby authorized and empowered to construct, maintain and operate,
a single or double track railway, with all necessary and convenient tracks
for turn-outs, side tracks and appendages, in the city of Chicago, and in,
on, over and along such street or streets, highway or highways, bridge or
bridges, river or rivers, within the present or future limits of the south
and west divisions of the city of Chicago, as the common council of said
city have authorized said corporators, or any of them, or shall, from time
to time authorize said corporations, or either of them, so to do in such
manner, and upon such terms and conditions, and with such rights and
privileges, immunities and exemptions, as the said common council has
or may by contract with said parties, or any or either of them prescribe,
and any and all acts or deeds of transfer of rights, privileges or franchises,
between the corporations in said several acts named or any two of them,
and all contracts, stipulations, licenses and undertakings, made, entered
into or given, and as made or amended by and between the said common
council, and any one or more of the said corporations, respecting the loca-
tion, use or exclusion of railways in or upon the streets, or any of them
of said city shall be deemed and held and continued in force during the life
hereof as valid and effectual, to all intents and purposes, as if made a part,
and the same are hereby made a part of said several acts: *Provided,* that
it shall be competent for the said common council, with the written consent
or concurrence of the other party or parties, or their assigns, to any of said
contracts, stipulations, licenses or undertakings, to amend, modify or
annul the same; but said corporations shall not, or any or either of them,
be liable for the loss of any property or thing carried on said railways,
kept in and under the care of its owner, his servant or agent: *Provided,*
that any contract hereafter made by the common council of the city of
Chicago, with either of the corporations referred to in this act, for a higher
rate of fare than five cents, shall be subject to modification or repeal at
any regular meeting of said common council, by a majority vote of all the
aldermen elected, or by the general assembly of the State of Illinois.

U. S. 522; *Overton, Trustee,* v. *Memphis & Little Rock R. R. Co.,* 10 Fed. Rep. 866; *People* v. *Weigley,* 155 Illinois, 491.

Regarded as a bill to remove a cloud from and quiet title to property in the custody of the receivers, the allegations of the bill and proofs were insufficient to warrant the exercise of the jurisdiction of the court. *Preston* v. *Smith,* 26 Fed. Rep. 885; *Madison Ave. Baptist Church* v. *Madison Ave. Baptist Church,* 26 How. Pr. 73; *Hannewinkle* v. *Georgetown,* 15 Wall. 547; *Meloy* v. *Dougherty,* 16 Wisconsin, 287; *Dunklin County* v. *Clark et al.,* 51 Missouri, 60; *Leech* v. *Day,* 27 California, 644, 648; *Gamble* v. *Loop,* 14 Wisconsin, 505; *Parker* v. *Shannon,* 121 Illinois, 452; *Spring Valley Waterworks &c.* v. *Bartlett, Mayor,* 16 Fed. Rep. 616; *Sanders* v. *Village of Yonkers,* 63 N. Y. 489; *Fox* v. *Williams,* 92 Wisconsin, 320; *Ogden City* v. *Armstrong,* 168 U. S. 224; *Benjamin Rich* v. *Tamlin Braxton et al.,* 158 U. S. 375; *Simpson* v. *Edmiston,* 23 W. Va. 675, 678; *Roby* v. *South Park Commissioners,* 215 Illinois, 200; *Holland* v. *Challen,* 110 U. S. 15; *United States ex rel. McIntosh* v. *Crawford et al.,* 47 Fed. Rep. 561. Regarded from the point of view of bills to prevent an interference on the part of the city with the receiver's possession of the estate, the *allegata et probata* made out no case of interference or threatened interference.

Under the revised charter of the city of Chicago of 1851, which gave the common council of the city of Chicago power to "exclusively control and regulate the streets and alleys," the common council had lawful authority to pass ordinances granting the privilege of constructing and operating street railways on the streets of Chicago, and to prescribe the terms and conditions of such grants. *Moses* v. *P. F. W. &c. R. R. Co.,*

SEC. 3. [As to the Chicago and Evanston Railroad.]

SEC. 4. Each of said corporations shall be authorized to purchase, hold and convey, real or personal estate, necessary for the use of such corporation, and to manufacture materials, machinery and rolling stock, for the use of such corporation.

SEC. 5. This act shall be deemed a public act, and noticed by all courts as such, without pleading, and shall take effect from its passage.

21 Illinois, 522; *Murphy* v. *Chicago*, 39 Illinois, 286; *Chicago Dock Co.* v. *Garrity*, 115 Illinois, 155; *McWethy* v. *Aurora Elec. Light Co.*, 202 Illinois, 218; *State* v. *Murphy*, 134 Missouri, 548; *Chicago Telephone Co.* v. *N. W. Telephone Co.*, 199 Illinois, 324; *Union Traction Co.* v. *City of Chicago*, 199 Illinois, 484, 523; *City of St. Louis* v. *Bell Telephone Co.*, 96 Missouri, 629; *Atchison Street R. Co.* v. *Pacific Ry. Co.*, 31 Kansas, 660; *State* v. *Carrigan Consolidated Street Ry. Co.*, 85 Missouri, 263; *City of St. Louis* v. *Western Union Tel. Co.*, 149 U. S. 464; Dillon, Mun. Corp. § 727.

Especially does such authority exist where, as in Chicago, the municipality owns the streets in fee. *City of Chicago* v. *Union Bldg. Assn.*, 102 Illinois, 379; *City of Mt. Carmel* v. *Shaw*, 155 Illinois, 37; *City of Chicago* v. *Rumsey*, 87 Illinois, 348.

The ordinance passed by the common council of the city of Chicago on August 16, 1858, was a valid exercise of its charter power "to regulate the streets," and gave to Parmalee and his associates the power to construct and operate street railways on the streets therein described, including Madison street, from State street to Western avenue, upon the terms and conditions therein stated, including the time limitation therein contained. The ordinance also constituted a valid contract between the city of Chicago and Parmalee and his associates, by means whereof the city became vested with the right, at any time after August 16, 1883, to purchase the street railway lines therein described, and the property appurtenant to and then used in connection therewith, at a price to be determined by appraisement, in accordance with the provisions of the ordinance.

The act of February 14, 1859, is unconstitutional and void. The constitution of Illinois then in force provided that no private or local act should contain more than one subject. The act is a private or local act, although its last section declared "This act shall be deemed a public act," etc. *McCartney* v. *C. & E. R. R. Co.*, 112 Illinois, 611; *Belleville &c. R. R. Co.* v.

*Gregory,* 15 Illinois, 28; *State* v. *I. C. R. R.,* 33 Fed. Rep. 730, opinion by Mr. Justice Harlan.

The act embraced the general subject of the incorporation of the Chicago City Railway Company, the method of its government, its capitalization, the exercise of certain powers of eminent domain, and the authority to construct and operate street railways in the south and west divisions of the city, where and as the city should by ordinance prescribe, with important exemptions and immunities from the ordinary liability of common carriers; the extension of its business beyond the limits of Chicago; the organization of another private corporation, the North Chicago City Railway Company, with like powers and duties, privileges and exemptions, in the north division of Chicago. Apparently *contra* is an expression, manifestly *obiter dictum,* in *N. C. C. Ry. Co.* v. *Lake View,* 105 Illinois, 213. Such an act embracing more than one subject is unconstitutional, even though both subjects are expressed in its title. *People* v. *Nelson,* 133 Illinois, 565, 577; Cooley, Const. Lim. 6th ed. ch. 6, § 4, p. 177.

The real subject of the first nine sections of this act was the creation of one certain private corporation. The real subject of the tenth section of this act was the creation of another and entirely distinct private corporation. A private or local act which attempts to incorporate two private corporations, and make two separate contracts between the State and the private interests concerned in the corporations, offends against the constitutional inhibition. *Belleville & Ill. R. R. Co.* v. *Gregory,* 15 Illinois, 20; *People* v. *Denahy,* 20 Michigan, 349; *Ex parte Conner,* 51 Georgia, 571; *King* v. *Banks,* 61 Georgia, 20. And for a close analogy see *Supervisors of Fulton County* v. *M. & W. R. R. Co.,* 21 Illinois, 338; *People ex rel. &c.* v. *County of Tazewell,* 22 Illinois, 147.

The title was "An act to promote the construction of horse railways in the city of Chicago." Section 5 attempted to authorize the corporation to extend its railways "to any point or points within the County of Cook," and section 6 attempted

to authorize said corporation, "with the assent of the supervisor of any township, to lay down and maintain its said railway or railways in, upon, over and along any public highway in said township." The sections providing for such extension beyond the city limits are not expressed in the words "in the city of Chicago," which limit the whole title, and are, therefore, void. *People ex rel.* v. *Mellen*, 32 Illinois, 181; *Lockport* v. *Gaylord*, 61 Illinois, 276; *People* v. *Inst. of Protestant Deaconesses*, 71 Illinois, 229; *Middleport* v. *Ætna Life Ins. Co.*, 82 Illinois, 562; *Snell* v. *Chicago,* 133 Illinois, 413; *Ex parte Paul,* 94 N. Y. 497.

If said act is valid to any extent and for any purpose, the only rights which the complainants could receive thereunder would be limited to horse railways in the city. *North Chicago City Ry. Co.* v. *Town of Lake View*, 105 Illinois, 207.

The preëxisting charter power of the city, recognized and reaffirmed by this act, to prescribe terms and conditions, included the power to fix the time when the privileges granted should terminate. *Cleveland Elec. Co.* v. *Cleveland*, 137 Fed. Rep. 111; *Louisville Trust Co.* v. *Cincinnati*, 76 Fed. Rep. 296; *Detroit Citizens' St. Ry. Co.* v. *Detroit*, 64 Fed. Rep. 646; *Chicago Terminal R. R. Co.* v. *Chicago*, 203 Illinois, 576; *Coverdale* v. *Edwards*, 155 Indiana, 374; *Plymouth Township* v. *Railway*, 168 Pa. St. 181, 187; *Minersville Borough* v. *Schuylkill Elec. Ry. Co.*, 205 Pa. St. 294. The time limit and the consent are inseparable. The court cannot strike down the one and hold the other valid. The consent must stand or fall in its entirety. *St. Louis & Meramec R. R. Co.* v. *City of Kirkwood*, 159 Missouri, 238, 253; Elliott on Railroads, § 1081; *Blaschko* v. *Wurster*, 156 N. Y. 437, 444.

Where a municipality has the power to give or refuse consent to the occupation and use of its streets for street railway purposes, it may impose terms and conditions, including a time limit; and an acceptance of a grant carries with it all the conditions and limitations upon which it is based. *Chicago Terminal R. R. Co.* v. *Chicago*, 203 Illinois, 576, 589; *Byrne* v.

*Chicago Gen. Ry. Co.,* 169 Illinois, 75; *Chicago Gen. Ry. Co.* v. *Chicago,* 176 Illinois, 253; *City of Chester* v. *W. C. & W. R. R. Co.,* 182 Illinois, 382; *People* v. *Suburban R. R. Co.,* 178 Illinois, 594; *Coverdale* v. *Edwards,* 155 Indiana, 374; *Plymouth Township* v. *Ry. Co.,* 168 Pa. St. 181, 186; *Minersville Borough* v. *Schuylkill Elec. Ry. Co.,* 205 Pa. St. 394, 401; *Allegheny City* v. *Millvale &c. Ry. Co.,* 159 Pa. St. 411, 414; *St. Louis & Meramec R. R. Co.* v. *City of Kirkwood,* 159 Missouri, 239; *City of Detroit* v. *Detroit Ry.,* 95 Michigan, 456; Elliott on Railroads, § 1081; McQuillin on Mun. Ord. § 576; Dillon on Mun. Corp. 3d ed. § 706.   The companies and the city for over forty years have repeatedly contracted for limited periods of street occupancy.   The grants of the city have proceeded upon its right and power, and the full recognition thereof by the companies, to impose time limits.   This practical construction of the acts and ordinances is controlling.   *Insurance Co.* v. *Dutcher,* 95 U. S. 269, 273; *Topliff* v. *Topliff,* 122 U. S. 131; *Chicago* v. *Sheldon,* 9 Wall. 54; *Lehigh Coal & Nav. Co.* v. *Harlan,* 27 Pa. St. 439; *District of Columbia* v. *Gallagher,* 124 U. S. 505; *Burgess* v. *Badger,* 124 Illinois, 295.

The act of February 21, 1861, incorporating the Chicago West Division Railway Company, is also unconstitutional and void because it embraces more than one subject, to wit: The creation of the private corporation named in section 1 thereof, and the vesting of said company with powers conferred upon another company by certain sections of the act of February 14, 1859; the authorization of contracts between said private corporations for the purchase of ordinance rights and privileges; the creation and definition of certain misdemeanors, and the establishment of penalties for the commission thereof.   So much of the act as sought to vest in the company the power enumerated in the fifth and sixth sections of the act of February 14, 1859, is void because the subject matter of said sections five and six is not expressed in the title of said act of February 21, 1861, or the title of said act of February 14, 1859.

So much of said act of February 21, 1861, as attempted to

vest the company with power to acquire, unite and exercise the powers, franchises and privileges of the Chicago City Railway Company, by the act of February 14, 1859, or by any of the ordinances of the common council, on such terms as should be agreed upon by a contract between said corporations, is void, because the subject matter thereof is not expressed in the title of said act. The act, if valid to any extent, merely vested said Chicago West Division Railway Company with power to accept grants of street railway privileges in the streets of the city from the common council, and to recognize the preëxisting right of the city to pass such ordinances and prescribe the terms and conditions of such grants, including the period of time at which the said privileges should terminate.

The act of February 6, 1865, is unconstitutional and void, in that it embraced more than one subject, to wit: The amendment of two separate private and local acts of the General Assembly; the ratification of deeds of transfer of rights, privileges and franchises between the corporations in said acts named; the ratification of ordinance contracts between the city and said corporations; the ratification of an ordinance contract with still another private corporation (the Chicago & Evanston Railroad), not mentioned in the acts of 1859 and 1861. None of the sections of this act except those the subject matter of which is expressed in the general words of the title, "Horse Railways in the city of Chicago," is valid. *N. C. C. Ry. Co.* v. *Lake View*, 105 Illinois, 207. The ratification of (*a*) the conveyances from one private corporation to another private corporation of personal property and ordinance rights and of (*b*) contracts between these companies respectively and the city, are not included within the title of the act. *Village of Lockport* v. *Gaylord*, 61 Illinois, 276.

The act did not amend sections 5 or 6 of said act of 1859, nor did it purport to extend or affect contracts between the companies and township supervisors. Nor did it extend or affect street railway privileges or ordinance contracts in any of the streets mentioned in the exclusion clause of the Chicago

and Evanston charter; reënacted in section 3 of said act of 1865.

The expression "during the life hereof," as used in the said second section, is vague and ambiguous. It may be capable of three interpretations: As meaning the life of the act; or the life of the deeds, licenses and contracts; or the lives of the railway corporations, respectively. That interpretation of the words, "during the life hereof," must be adopted, which will give to the companies as against the city and the public the minimum of privileges in the streets. *Coosaw Mining Co.* v. *South Carolina*, 144 U. S. 550; *Stein* v. *Bienville Water Supply Co.*, 141 U. S. 67; *Fertilizing Co.* v. *Hyde Park*, 97 U. S. 659, 666; *Central Transportation Co.* v. *Pullman's Car Co.*, 139 U. S. 24, 49; *Citizens' St. Ry. Co.* v. *Detroit Ry.*, 171 U. S. 48, 54; *Freeport Water Co.* v. *Freeport City*, 180 U. S. 587, 598; *Long Island Water Supply Co.* v. *Brooklyn*, 166 U. S. 696; *Rockland Water Co.* v. *Camden &c. W. Co.*, 80 Maine, 562, 563; *Chicago Terminal R. R. Co.* v. *Chicago*, 203 Illinois, 576. See also *Long* v. *City of Duluth*, 49 Minnesota, 280; *S. C.*, 51 N. W. Rep. 913; *Wright* v. *Nagel*, 101 U. S. 796; *Charles River Bridge* v. *Warren Bridge*, 11 Pet. 544, 549 *et seq.*, and notation thereon in 3 Rose's Notes to United States Reports, pp. 582–587; *City of Detroit* v. *Detroit City Ry. Co.*, 56 Fed. Rep. 872, 873; *Omaha Horse Ry.* v. *Cable Tramway Co.*, 30 Fed. Rep. 324; *Citizens' Street Co. Ry. Co.* v. *Jones*, 34 Fed. Rep. 579; *Syracuse Water Co.* v. *City of Syracuse*, 116 N. Y. 167; *S. C.*, 22 N. E. Rep. 381; *State* v. *Consumers' Co.*, 51 N. J. L. 422; *Freeport W. W. Co.* v. *Prager*, 3 Pa. Co. Ct. 371; *Saginaw Gas L. Co.* v. *Saginaw*, 28 Fed. Rep. 529; *Clarksburg Elec. L. Co.* v. *Clarksburg* (W. Va. 1900), 50 L. R. A. 142; *Commonwealth* v. *E. & E. R. R. Co.*, 27 Pa. St. 339.

The rule of construction is well settled that where a statute or clause of a statute contains repugnant or irreconcilable provisions the last in order of date or position must prevail. Endlich on Interpretation of Statutes, § 183; Potter's Dwarris on Statutes, p. 156 and n.; *Harrington* v. *Trustees*, 10 Wend. 554;

*Brown* v. *County Commissioners*, 21 Pa. St. 42, 43; *Pacher* v. *Sunbury R. R. Co.*, 19 Pa. St. 211; *Hall* v. *Equator &c. Co.*, Fed. Cas. No. 5931; *Smith* v. *Moore,* 26 Illinois, 396; *Quick* v. *Whitewater Twp.*, 7 Indiana, 578.    As against a statute framed in covert and obscure language, and claimed to ratify and confirm by wholesale the acts of a municipality in its dealings with the claimants, the court will adopt the strictest possible construction in order to prevent the wresting of valuable rights from the public by such insidious and surreptitious legislation. *Oakland* v. *Oakland Water Front Co.*, 118 California, 160, 194; *Coosaw Mining Co.* v. *South Carolina*, 144 U. S. 550–561; Ordranaux on Const. Legislation, p. 604.

The act of February 6, 1865, did not postpone the date when the city might purchase from the Chicago West Division Railway Company under the ordinance of August 16, 1858.    The right of purchase was conferred by the Parmalee ordinance of August 16, 1858, and affirmed by section 7 of the act of 1859, for the period of twenty-five years.    This right was affirmed by the act of 1865; and said section 7 of said act of 1859 was not amended by the act of 1865.

If the act of 1865 be construed as postponing the date upon which the city was entitled to purchase the railway property, then the act impairs the obligation of the city's contract with the company and deprives the city of its property without due process of law, in violation of the Constitution of the United States and of the State of Illinois.    Art. I, sec. 10, Constitution U. S.; Art. V and XIV, Amendments to Constitution U. S.; Art. XIII, sec. 17, Const. Ill. 1848.    The right of purchase vested in the city was a private property right which it could sell.    *De Motte* v. *Valparaiso* (Ind.), 67 N. E. Rep. 985.

In contracting with the railway company for the purchase of its rails, cars, etc., the city was acting in its proprietary or business capacity and not in its governmental capacity, and its contract is within the constitutional protection.    *Wagner* v. *City of Rock Island*, 146 Illinois, 139, 154; *County of Richland* v. *County of Lawrence*, 12 Illinois, 1; *Cicero Lumber Co.* v. *Town*

*of Cicero,* 176 Illinois, 1; *Board of Park Com'rs* v. *Detroit,* 28 Michigan, 230; *Western Sav. Fund Soc.* v. *City of Philadelphia,* 31 Pa. St. 185, 189; *Trustees Dartmouth College* v. *Woodward,* 4 Wheat. 518, 633; *Pike's Peak Power Co.* v. *City of Colorado Springs,* 105 Fed. Rep. 111; *Proprietors Mt. Hope Cemetery* v. *City of Boston,* 158 Massachusetts, 509, 511; *Town of Milwaukee* v. *City of Milwaukee,* 12 Wisconsin, 93; *New Orleans Ry. Co.* v. *New Orleans,* 26 La. Ann. 478, 481; *State* v. *Barker,* 116 Iowa, 96, 244; *Montpelier* v. *E. Montpelier,* 29 Vermont, 12, 19.

The following species of property have been held to be possessed by a city in its capacity as a private corporation: Water works system, *Bailey* v. *The Mayor of N. Y.,* 3 Hill, 531; *Pike's Peak Power Co.* v. *Colorado Springs,* 105 Fed. Rep. 1. A building used partly for a city hall and partly rented out for offices, *Oliver* v. *Worcester,* 102 Massachusetts, 489. Gas works, *Scott* v. *Mayor of Manchester,* 2 H. & N. 204, 210; *The Western Savings Fund Society* v. *Philadelphia,* 31 Pa. St. 185; *S. C.,* 31 Pa. St. 135. Water lots granted by the State to the city of San Francisco, *Grogan* v. *San Francisco,* 18 California, 590. Ferries and railway franchises, *Mayor &c.* v. *Second Avenue Railway Co.,* 32 N. Y. 261. Public wash houses, *Cowley* v. *The Mayor &c. of Sunderland,* 6 H. & N. 565. A public cemetery, *Proprietors of Mount Hope Cemetery* v. *Boston,* 158 Massachusetts, 509.

Upon failure of a company to construct a specific line within the time allowed therefor in the particular ordinance covering the same, all rights of the company to construct under said ordinance lapsed. *Atchison St. Ry. Co.* v. *Nave,* 38 Kansas, 744; *Wilmington City Ry. Co.* v. *Wilmington & B. S. Ry. Co.,* 46 Atl. Rep. 12; and see *St. Louis* v. *Western Union Tel. Co.,* 148 U. S. 92; *Minersville Borough* v. *Schuylkill &c. Ry.* Co., 205 Pa. St. 294; *S. C.,* 54 Atl. Rep. 1050.

Where an ordinance authorizes construction of a particular street railway line, but nothing is done under it and subsequently another new and plainly superseding ordinance, relating to the same privilege, and to the same grantee, is passed,

the provisions of the last ordinance will control, and acceptance of and action under the last ordinance will be a waiver, surrender or abandonment of any privileges sought to be conferred by the first ordinance. The second ordinance is, in legal effect, a revocation of and a substitution for the first. *East St. Louis Union Ry. Co.* v. *City of East St. Louis,* 39 Ill. App. 400; *Logansport Ry. Co.* v. *Logansport,* 114 Fed. Rep. 688; *Cleveland Elec. Ry. Co.* v. *Cleveland,* 137 Fed. Rep. 111; *Cain* v. *Wyoming,* 104 Ill. App. 540; *Belleville* v. *Cit. Horse R. Co.,* 152 Illinois, 171; *Galveston City R. Co.* v. *Galveston City St. Ry. Co.,* 63 Texas, 529. Failure to construct or operate forfeits rights of the grantee, as the chief consideration of the grant is the performance of the public service. *Citizens' St. Ry. Co.* v. *Jones,* 34 Fed. Rep. 579; *State* v. *E. Fifth St. Ry. Co.,* 140 Missouri, 539; *Louisville T. Co.* v. *Cincinnati,* 76 Fed. Rep. 726. A mere colorable operation is not sufficient. *Snouffer* v. *Cedar Rapids &c. Ry. Co.,* 92 N. W. Rep. 79.

Street railway rights on any streets under an ordinance which may be construed to contain no provision for the term of the grant are terminable at the will of the city council. *Boise City & C. Co.* v. *Boise City,* 123 Fed. Rep. 232; *Lambe* v. *Manning,* 171 Illinois, 612; *Freeport Water Co.* v. *Freeport,* 186 Illinois, 179; *S. C.,* 180 U. S. 587. A grant indefinite as to time will be construed as perpetual and therefore void under the strict rule of construction applicable to such grants. *Milhau et al.* v. *Sharp et al.,* 27 N. Y. 611; *West End &c. Co.* v. *Atlantic &c. Co.,* 49 Georgia, 151, 155; *State of New York* v. *Mayor &c.,* 3 Duer, 119; *Blaschko* v. *Wurster,* 156 N. Y. 432; *Ampt* v. *City of Cincinnati,* 21 Ohio Cir. Ct. 300; *Birmingham* v. *Birmingdam St. R. Co.,* 79 Alabama, 465, 473. And the rule is established, by a preponderance of the later authorites, that where the constitution or statute of a State fixes a maximum period of time for which a franchise may be granted, or a contract made, a franchise or contract running for a longer time is wholly void, and will not be upheld for the valid period. *Flynn* v. *Little Falls E. & W. Co.,* 74 Minnesota, 180; *Gaslight*

&c. Co. v. *City of New Albany,* 156 Indiana, 406; *S. C.,* 59 N. E. Rep. 176; *State* v. *Minnesota Transfer Ry. Co.,* 83 N. W. Rep. 32; *Westminster Water Co.* v. *City,* 56 Atl. Rep. 990; *City of Somerset* v. *Smith,* 49 S. W. Rep. 456; *Manhattan T. Co.* v. *City of Dayton,* 59 Fed. Rep. 327; *City of Fort Wayne* v. *Lehr,* 88 Indiana, 62; *Blaschko* v. *Wurster,* 156 N. Y. 437; *Davis* v. *Harrison,* 46 N. J. L. 79.

Apparently, *contra, Cedar Rapids Water Co.* v. *Cedar Rapids,* 118 Iowa, 234, 240.

And see, also, as to invalidity of grants of street privileges for any fixed term, in absence of express charter authority, *City of Wellston* v. *Morgan,* 59 Ohio St. 147, 157; *East St. Louis* v. *East St. Louis G. L. & C. Co.,* 98 Illinois, 415, 432, 456; *Garrison* v. *City of Chicago,* 7 Biss. 480, 487; *West End &c. Co.* v. *Atlantic &c. Co.,* 49 Georgia, 151, 155; *State* v. *Minn. Transfer Ry. Co.,* 83 N. W. Rep. 32; *Gas Co.* v. *Parkersburg,* 30 W. Va. 435, 440; *Syracuse W. Co.* v. *City,* 116 N. Y. 167, 182; *City of Danville* v. *Danville W. Co.,* 178 Illinois, 299, 306; *S. C.,* 180 Illinois, 235; *Northern Cent. Ry. Co.* v. *Maryland,* 187 U. S. 258, 270; *People* v. *Pullman Car Co.,* 175 Illinois, 125; *Harvey* v. *Aurora & Geneva Ry. Co.,* 174 Illinois, 295, 307; *Cumberland Tel. & T. Co.* v. *City,* 127 Fed. Rep. 187; *People ex rel.* v. *Chicago Gas T. Co.,* 130 Illinois, 268; *Chas. Simons' Sons Co.* v. *Maryland Tel. & Tel. Co.* (Md. 1904), 57 Atl. Rep. 193; *S. C.,* 63 L. R. A. 727; *Pennsylvania Railroad* v. *St. Louis &c. Railroad,* 118 U. S. 290, 309, 312.

The general city and village law, from the date of its adoption, limited all municipal street railway grants to twenty years. Clause 24, sec. 1, Art. V, Cities and Villages Act; *Chester* v. *W. C. & W. R. R. Co.,* 182 Illinois, 382, 389. This limitation cannot be avoided by artifice or indirection. *Cedar Rapids Water Co.* v. *Cedar Rapids,* 118 Iowa, 234, 240; *Gas Light & Coke Co.* v. *New Albany,* 156 Indiana, 406; *Blaschko* v. *Wurster,* 156 N. Y. 432.

The city is not estopped to assert the invalidity of any grant beyond twenty years or otherwise *ultra vires. City of Chester*

v. *W. C. & W. R. R. Co.*; 182 Illinois, 382; *Cedar Rapids W. Co.* v. *Cedar Rapids*, 91 N. W. Rep. 1081; *Levis* v. *City of Newton*, 75 Fed. Rep. 889, 890; *City of Detroit* v. *Detroit City Ry. Co.*, 56 Fed. Rep. 893, 894; 20 Am. & Eng. Ency. of Law, 1182, and n. . And see *Seeger* v. *Mueller*, 133 Illinois, 85, 94, quoted with approval in *City of Danville* v. *Water Co.*, 178 Illinois, 311; *Snyder* v. *City of Mt. Pulaski*, 176 Illinois, 397; *Cedar Rapids W. Co.* v. *Cedar Rapids*, 91 N. W. 1081, 1085, *Attorney General* v. *Bristol W. W. Co.*, 10 Exch. 884; *S. C.*, 24 L. J. Exch. (N. S.) 205.

By accepting the "power" ordinance of March 30, 1888, the Chicago West Division Railway Company expressly recognized and agreed to the time limitations prescribed in the ordinances under which the various lines of the company were being operated, as a legitimate exercise of the power of the city to fix time limits. It was at the end of those time limits that the company agreed to remove its tracks. *Cleveland E. R. Co.* v. *Cleveland*, 137 Fed. Rep. 118.

The Chicago West Division Railway Company, Chicago City Railway Company and North Chicago City Railway Company, had no corporate capacity to accept permission from the city of Chicago to operate its cars by other than animal power. *North Chicago Street Railway Co.* v. *Town of Lake View*, 105 Illinois, 207; *McCartney et al.* v. *Chicago Edison Co. et al.*, 112 Illinois, 611, 653; *Omaha Horse Railway Co.* v. *Cable Tramway Co.*, 30 Fed. Rep. 324; *Farrell* v. *Winchester Ave. R. R. Co.*, 61 Connecticut, 127; *Rapid Transit Company* v. *The Hawaiian Tramway Companies, Limited*, 13 Hawaiian Reports, 371, 374; *Indiana Cable Street Railroad Company* v. *The Citizens' Railroad Company*, 8 L. R. A. 539, 548; *Newport & Newport* v. *Dayton Street Railway Co.*, 1 Ky. L. Rep. 404; *The People ex rel. Third Avenue Railway Company* v. *Newton*, 112 N. Y. 396, 407; *V. & S. Railway Co.* v. *Denver Street Railway Co.*, 2 Colorado, 673, 680.

The leases and transfers under which the receivers claim are invalid. Thompson, Law of Corporations, vol. 5, § 5880;

Noyes, Intercor. Rel. §§ 135, 170, 172; Rev. Stat. Ill. ch. 114, §§ 44, 45 (Hurd's ed.); ch. 114, Rev. Stat. of Ill. § 29; *Evans v. City of Chicago,* 24 Illinois, 52; Rev. Stat. Ill. ch. 32; Rev. Stat. Ill. ch. 120, §§ 32, 40; *People ex rel. v. Chicago Gas Trust,* 130 Illinois, 268, 285; *Oregon Railroad Co.* v. *Oregonian R. R. Co.,* 130 U. S. 1; *Chicago Union Traction Co.* v. *City of Chicago,* 199 Illinois, 484; *Cox* v. *Terre Haute & I. R. R.,* 133 Fed. Rep. 371, 374.

*Mr. Brainard Tolles, Mr. John S. Miller* and *Mr. John G. Johnson,* with whom *Mr. Joseph S. Auerbach, Mr. W. W. Gurley, Mr. John P. Wilson* and *Mr. John J. Herrick* were on the briefs, for the receivers and the railway corporations:

The Circuit Court has jurisdiction of the controversies presented by these bills. The jurisdiction of the court herein must be determined alone from the record of these cases in equity, now here on appeal. The transcripts of the record of the suits at law in which the judgments were recovered, which were the basis of the creditors' bills in which the receivers were appointed, are no part of the transcript of record here. Nor are the transcripts of record of such creditors' suits. *Pacific R. Co.* v. *Missouri Pacific R. Co.,* 111 U. S. 505, 522; *Continental Trust Co.* v. *Toledo &c. R. Co.,* 82 Fed. Rep. 642, 645; *Richardson* v. *Loree,* 94 Fed. Rep. 375, 379. They are records of other suits than those before the court on these appeals. Neither of them can be looked into in order to defeat the jurisdiction of the court below to enter these decrees; although there is authority that they might be offered in evidence here, if necessary, in order to sustain the decrees. *Wines* v. *Mayor,* 70 N. Y. 613, 614; *Stillwell* v. *Carpenter,* 62 N. Y. 639.

The declarations in each case showed that promissory notes were delivered to the plaintiff by the defendant bearing the indorsement of the assistant treasurer of the maker, and that the money was advanced to the defendant by the plaintiff, so that the plaintiff held the notes as first taker, and not as an assignee. The jurisdiction of the Circuit Court to render judg-

ment on the notes was clear. *Wachusett Nat'l Bank* v. *Sioux City Stove Works*, 56 Fed. Rep. 321; *Holmes* v. *Goldsmith*, 147 U. S. 150; *Bank of British North America* v. *Barling*, 46 Fed. Rep. 357.

The notes were made payable to the order of the makers and by them indorsed, as held by this court in *Falk* v. *Moebs*, 127 U. S. 597. And that question is one of general commercial law on which that decision is conclusive and not of Illinois law as conceived by counsel for the city of Chicago. *Burgess* v. *Seligman*, 107 U. S. 20; *Independent Dist.* v. *Rea*, 111 Fed. Rep. 1; *Peck* v. *Central Vt. R. R.*, 79 Fed. Rep. 590; *Phipp* v. *Harding*, 70 Fed. Rep. 468; *Windsor Bank* v. *McMahon*, 38 Fed. Rep. 283; *Bank* v. *Board*, 90 Fed. Rep. 7. In any event, the common counts in the declaration for money loaned and advanced to the defendant, and upon an account stated, etc., showed a controversy within the jurisdiction of the court, and it must be presumed that these counts were sustained by proof. *Cuddy, Petitioner*, 131 U. S. 280; *Galpin* v. *Page*, 18 Wall. 350; *Wolcott* v. *Coleman*, 2 Connecticut, 324; *Bunyea* v. *Metropolitan R. Co.*, 19 D. C. App. 76; *Harvey* v. *Laflin*, 2 Indiana, 477. Again, this attack on the judgments is a collateral attack, and cannot be made. Every intendment is made in their favor. *Cuddy, Petitioner*, 131 U. S. 280, 285; Van Fleet, Collateral Attack, §§ 12, 829.

The jurisdiction of the court to entertain the creditors' bills brought for the collection of these judgments rested upon the ground that said bills were brought for the collection of judgments at law rendered by said Circuit Court of the United States, and upon the ground of diversity of citizenship. That jurisdiction cannot be here collaterally questioned. *Re Cuddy*, 131 U. S. 280, 285; *Commercial Bank* v. *Burch*, 141 Illinois, 519; *St. Paul Trust Co.* v. *St. P. Pub. Co.*, 60 Minnesota, 105; *Cap. City Ins. Co.* v. *Boggs*, 172 Pa. St. 91.

The jurisdiction of the Circuit Court to entertain the bills upon which the present decrees were rendered was dependent upon three grounds: The fact that the subject matter of the

controversy was in the actual possession of receivers appointed by the Circuit Court of the United States. The fact that the purpose of the action was to aid in the collection of judgments at law by preserving certain assets properly applicable to the satisfaction of said judgments, and by establishing and quieting the title of the receivers to property of which they were in possession or with which they were vested, and which it might become necessary to sell in the course of a complete administration of the property of said corporation defendants for the benefit of their creditors. The fact that the ground of action was the attempted impairment of the obligation of a contract by the ordinances, resolutions and legislative acts of the defendant, acting through its common council, and the imminent danger of further action in the same direction with still more destructive consequences. *Freeman* v. *Howe,* 24 How. 450; *Krippendorf* v. *Hyde,* 110 U. S. 276; *Gumbel* v. *Pitkin,* 124 U. S. 131; *Morgan's Company* v. *Texas Central Ry.,* 137 U. S. 171; *In re Tyler,* 149 U. S. 164; *Rouse* v. *Letcher,* 156 U. S. 47; *White* v. *Ewing,* 159 U. S. 36; *Pope* v. *Louisville &c. Ry.,* 173 U. S. 570; *Porter* v. *Sabin,* 149 U. S. 473, 479; *Byers* v. *McAuley,* 149 U. S. 608, 618; *Price* v. *Abbott,* 17 Fed. Rep. 506; *Armstrong* v. *Trautman,* 39 Fed. Rep. 275; *Compton* v. *Jesup,* 68 Fed. Rep. 263; *S. C.,* 15 C. C. A. 397; *Lanning* v. *Osborne,* 79 Fed. Rep. 657, 662; *Toledo &c. R. Co.* v. *Continental Trust Co.,* 95 Fed. Rep. 497, 505; *S. C.,* 36 C. C. A. 155; *Davis* v. *Martin,* 113 Fed. Rep. 6, 9; *S. C.,* 51 C. C. A. 27.

A Federal question was presented. *Vicksburg Water Works Co.* v. *Vicksburg,* 185 U. S. 65.

It makes no difference whether the repudiation by the city was legislative or administrative in its character—by ordinance or resolution. *Walla Walla* v. *Water Co.,* 172 U. S. 1; *American Waterworks &c. Co.* v. *Water Co.,* 115 Fed. Rep. 171; *Riverside &c. Ry. Co.* v. *Riverside,* 118 Fed. Rep. 736.

The jurisdiction in these actions cannot be impaired by collateral attacks on the judgments at law. *Cuddy, Petitioner,* 131 U. S. 280; *Cutler* v. *Huston,* 158 U. S. 423; *Dowell* v. *Ap-*

*plegate,* 152 U. S. 327; *W. B. Conkey Co.* v. *Russell,* 111 Fed. Rep. 417.

There was no collusion in bringing the suit. The only possible subject of collusion was in the choice of tribunals as between the courts of Illinois and the courts of the United States. "Collusion" can not be predicated of such choice. The right to make a choice was one given to the complainant by the Constitution and laws of the United States, without restriction as to motive. There being a real debt and a real diversity of citizenship, the motive of the creditor in bringing the suit is not a matter of inquiry in this court. *South Dakota* v. *North Carolina,* 192 U. S. 286, 310; *Dickerman* v. *Northern Trust Co.,* 176 U. S. 181, 190; *Lehigh Mining & Mfg. Co.* v. *Kelly,* 160 U. S. 327, 336; *Crawford* v. *Neal,* 144 U. S. 585; *Cheaver* v. *Wilson,* 9 Wall. 108, 123; *Smith* v. *Kernochen,* 7 How. 198, 216. See also *Sage* v. *Memphis &c. R. R. Co.,* 18 Fed. Rep. 571.

The Circuit Court had jurisdiction to render a decree protecting the possession and quieting the title of the receivers. The whole attitude of the municipal authorities was calculated to lead irresponsible persons to take the law into their own hands. It needed only some overt and conspicuous official act, like the notice from the Commissioner of Streets, to turn loose forces of chaos and destruction. The Mayor had by his public declarations and messages, made police protection a political impossibility.

That a court of equity has power to give relief against such an intolerable condition of affairs is clear. In holding that equity will give such relief, this court has shown no disposition to be restrained within the narrow limits of ancient precedents. Cases of this kind are *sui generis* and constitute a striking instance of the adaptability of equitable remedies to new conditions. *Walla Walla* v. *Walla Walla Waterworks Co.,* 172 U. S. 1, 12; *Los Angeles* v. *Los Angeles City Water Co.,* 177 U. S. 558, 581; *Detroit* v. *Detroit Citizens' Street Railway Co.,* 184 U. S. 368, 379; *Vicksburg Water Co.* v. *Vicksburg,* 185 U. S. 65; *Cleveland* v. *Cleveland City R. Co.,* 194 U. S. 517, 531.

The existence of a cloud upon title is one of the irreparable injuries of which the complainants complain and against which it is the duty of a court of equity to give relief. Where the cloud complained of is serious and substantial and occasions irreparable injury, relief is not limited to cases where there is an apparently valid lien or title outstanding. *Vicksburg Water Co.* v. *Vicksburg,* 185 U. S. 65; *American Waterworks &c. Co.* v. *Horn Water Co.,* 115 Fed. Rep. 171; *Detroit* v. *Detroit Citizens' Ry. Co.,* 184 U. S. 368. This is not only a principle of general equitable jurisprudence, but a part of the local law of Illinois. *Cicero Lumber Co.* v. *Town of Cicero,* 176 Illinois, 9; *Glucose Refining Co.* v. *Chicago,* 138 Fed. Rep. 209; *Monson* v. *Kill,* 144 Illinois, 248.

It is a maxim of equity that the court having once obtained jurisdiction over a subject matter, will proceed to a complete determination of the entire controversy between the parties relating to such subject matter. *United States* v. *Union Pacific R. Co.,* 160 U. S. 1, 52; *Ober* v. *Gallagher,* 93 U. S. 199; *Cathcart* v. *Robinson,* 5 Pet. 264.

The removal of a cloud from the title was within the ancillary jurisdiction of the court because it was essential to an intelligent administration of the property and to the full development of its public usefulness during the time that it should remain under the control of the court; and also to protect its value from unlawful impairment in case a sale should become necessary. *Davis* v. *Gray,* 16 Wall. 203; *Connor* v. *Alligator Lumber Co.,* 98 Fed. Rep. 155; *Lanning* v. *Osborne,* 79 Fed. Rep. 657; *In re Tyler,* 149 U. S. 164, 181; *Rouse* v. *Letcher,* 156 U. S. 47, 49.

It was no objection that complainants' title is an estate for years and not in fee. *Goldsmith* v. *Gilliland,* 22 Fed. Rep. 865; *McKee* v. *Howe,* 17 Colorado, 538; 31 Pac. Rep. 115; *Pennie* v. *Hildreth,* 81 California, 127, 130; *City of Newport* v. *Taylor's Ex'rs,* 55 Kentucky, 669.

The city's claim of a right to purchase was a cloud on title. The claim of an outstanding option of purchase, unaccom-

panied by any present attempt to exercise such option, was a cloud upon title from which the Circuit Court as a court of equity was bound to grant relief. *Sea* v. *Morehouse,* 79 Illinois, 216; *Altschul* v. *Hogg,* 62 Fed. Rep. 539; *Lane* v. *Lesser,* 135 Illinois, 567; *Monson* v. *Kill,* 144 Illinois, 248. This is generally recognized as a ground of relief in equity, even when no present possibility of trespass and no multiplicity of suits are to be apprehended. *Hodgen* v. *Guttery,* 58 Illinois, 431; *Key City Gas Light Co.* v. *Munsell,* 19 Iowa, 305; *Tucker* v. *Kenniston,* 47 N. H. 267. It is no objection to complainants' right to maintain the suit, that the city's claim is to a right *in futuro.* An unfounded claim to an estate in remainder or reversion is a cloud on title against which equity will give relief. *Rhea* v. *Dick,* 34 Ohio St. 420; *Niles* v. *Gray,* 12 Ohio St. 320; *Onderdonk* v. *Mott,* 34 Barb. 106; *Clark* v. *Darlington,* 7 S. Dak. 148. It is no objection to complainants' right to maintain the suit that they sue in a representative capacity. *Davis* v. *Gray,* 16 Wall. 203; *Laverty* v. *Sexton,* 41 Iowa, 435; *City of Newport* v. *Taylor's Ex'rs,* 55 Kentucky, 699. While it has been repeatedly held in Illinois that a suit to quiet title cannot be maintained by an administrator, the reason given is that the administrator has no estate or interest in the land, but only a power of sale. *Ryan* v. *Duncan,* 88 Illinois, 144. It is no objection that there is no statute of Illinois specifically authorizing it. Courts of equity have inherent jurisdiction to grant such relief in a proper case. *Whitney* v. *Stevens,* 97 Illinois, 482; *Lamb* v. *Farrell,* 21 Fed. Rep. 5; *Allen* v. *Halliday,* 25 Fed. Rep. 688; *Sharon* v. *Tucker,* 144 U. S. 533; *Holland* v. *Challen,* 110 U. S. 15. Nor that the defendant is a municipal corporation claiming certain powers under a statute of the State. *Watson* v. *City of Elizabeth,* 35 N. J. Eq. 345; *City of Newport* v. *Taylor's Ex'rs,* 55 Kentucky, 699; *Davis* v. *Gray,* 16 Wall. 203.

The complainants were under no obligation to set out specifically in their bills the nature of the adverse claims made by the city. It was sufficient to allege generally that such adverse

claims existed. *Ely* v. *New Mexico &c. R. Co.*, 129 U. S. 291; *Tolleston Club of Chicago* v. *Clough*, 146 Indiana, 93; *Holbrook* v. *Winsor*, 23 Michigan, 394. When issues have been joined and fully tried between the proper parties, the courts will not draw fine distinctions to defeat a remedy which it is in the public interest to have administered. *Detroit* v. *Detroit Citizens' Street R. Co.*, 184 U. S. 368; *Gridley* v. *Watson*, 53 Illinois, 186; *Mollie* v. *Peters*, 28 Nebraska, 670; *Goodrum* v. *Ayers*, 56 Arkansas, 93.

The franchises possessed respectively by the North Chicago City Railway Company and the Chicago West Division Railway Company to construct, maintain and operate street railways in the streets and other public places of the city of Chicago in and over highways in the county of Cook, were derived by direct grant from the State of Illinois. It was the duty of the legislature to provide increased transportation facilities in the streets. *Chicago & N. W. Ry.* v. *Chicago*, 140 Illinois, 309; *Chicago, B. & Q. Ry.* v. *Attorney General*, Fed. Cas. No. 2666; *Barney* v. *Keokuk*, 94 U. S. 341. The ownership of the fee of the streets by the city made no difference. *Palatine* v. *Kreuger*, 121 Illinois, 72.

It is equally clear, under the decisions in Illinois, that the public right of passage in 1859 was under the direct and immediate control of the General Assembly. Its powers in this respect had been delegated only to a limited extent, and for purposes clearly defined. In the exercise of these powers, in 1859, it was practically free from all constitutional restrictions. Except as modified by subsequent constitutional provisions, this continues to be the doctrine in Illinois to the present day. *People ex rel Jackson* v. *Suburban Railroad Co.*, 178 Illinois, 594; *West Chicago Park Commissioners* v. *McMullen*, 134 Illinois, 170. The act of 1865 was a legislative construction of the act of 1859 to this effect.

In every grant by a sovereign authority the courts will endeavor to see an intelligible and beneficial purpose, and will so construe the grant as to favor that purpose and not go be-

yond it. In a country constituted as this is, where sovereign powers are exercised by representative legislative bodies, the courts recognize but one mode of "favoring the State," and that is by sustaining and making effective the legislative purpose. *Romer* v. *St. Paul City R. Co.*, 75 Minnesota, 217; *Union Pacific Railroad Co.* v. *Hall*, 91 U. S. 343; *Pearsall* v. *Great Northern R. R.*, 161 U. S. 646; *State* v. *Newport St. Ry. Co.*, 16 R. I. 533; *State ex rel. &c.* v. *Hancock*, 35 N. J. L. 537; *Central Transportation Co.* v. *Pullman's Car Co.*, 139 U. S. 24; *Telephone Co.* v. *Manning*, 186 U. S. 238; *Wilmington City Ry.* v. *Railroad*, 46 Atl. Rep. 12; *Yates* v. *Milwaukee*, 10 Wall. 497; *Smith* v. *McDowell*, 148 Illinois, 51. It is only in matters not essential to the main object of the grant that the rule of strict interpretation will be applied. *Chicago Theological Seminary* v. *Illinois*, 188 U. S. 662, 676; *Brooklyn Heights R. Co.* v. *City of Brooklyn*, 152 N. Y. 244; *People ex rel.* v. *Deehan*, 153 N. Y. 528, 532.

Neither the city nor its common council ever possessed power, prior to May 3, 1875, to limit the time for the enjoyment of the grant made directly to these specially chartered companies by the General Assembly. Until the passage and acceptance of the Cities and Villages Act the whole power was retained by the assembly. The regulation of highways was purely a state function and the corporations created and affected by the acts prior to that time did not derive their powers from the municipality. See acts of 1859, 1861, 1865.

This view as to the powers of the common council under the acts of 1859, 1861 and 1865 finds support in the judicial decisions in many other States. *Westport* v. *Mulholland*, 159 Missouri, 86; *Atlantic City Water Works* v. *Consumers' Water Company*, 44 N. J. Eq. 427; *State* v. *Dayton Traction Co.*, 18 Ohio C. C. 490; *Galveston &c. R. Co.* v. *Galveston*, 90 Texas, 398; *Appeal of City of Pittsburgh*, 115 Pa. St. 4; *Citizens' Street R. Co.* v. *City R. Co.*, 64 Fed. Rep. 647; *Citizens' Street R. Co.* v. *City of Memphis*, 53 Fed. Rep. 715, 732; *National Foundry and Pipe Works* v. *Oconto*, 52 Fed. Rep. 29, 34; *Beek-*

*man* v. *Third Ave. R. R. Co.*, 153 N. Y. 144, 158; *The People ex rel.* v. *Deehan*, 153 N. Y. 528, 532.

There are limits on the rule of contemporaneous construction of legislative acts especially in the case of a public corporation. The municipality, through the exercise of its strictly municipal powers, can so far embarrass the work of any public service corporation, that the inducement to avoid controversy is almost irresistible. A "course of conduct" on the company's part under such circumstances may be more naturally referred to a desire to preserve the peace than to an intention to place a construction on a statute. *City of Chicago* v. *Evans*, 24 Illinois, 52; *City of Wichita* v. *Old Colony Trust Co.*, 132 Fed. Rep. 641; *Los Angeles* v. *Los Angeles Water Co.*, 177 U. S. 558.

Specific legislative authority was needed in order to enable the council to contract for a definite period of occupancy. *Peoples' Railroad* v. *Memphis Railroad*, 10 Wall. 38, 52; *Potter* v. *Collis*, 156 N. Y. 16; *Stillwater* v. *Lowry*, 83 Minnesota, 277. Or for a fixed rate of fare. *Detroit* v. *Detroit Citizens' Street Railway Co.*, 184 U. S. 368, 382. Or for incidental rights and privileges. *City of Chicago* v. *Sheldon*, 9 Wall. 50.

The act of February 14, 1859, embraced but one subject and the entire contents of said act were within the scope of its title. There may be included in an act any means which are reasonably adapted to secure the object indicated by the title. *Larned* v. *Tiernan*, 110 Illinois, 173; *People ex rel. &c.* v. *Ottawa Hydraulic Co.*, 115 Illinois, 281. The constitutional provision was not intended to require that every subject of the enactment, subordinate and incidental to the main subject thereof, should be specifically referred to in the title of the act. *Mahomet* v. *Quackenbush*, 117 U. S. 508; Sutherland Statutory Construction, p. 86. See also *People* v. *People's Gas Co.*, 205 Illinois, 482; *S. C.*, 194 U. S. 1; *Hoboken* v. *Pennsylvania R. R. Co.*, 124 U. S. 656; *Jonesboro City* v. *Cairo &c. R. R. Co.*, 110 U. S. 192; *Carter County* v. *Sinton*, 120 U. S. 517; *Van Brunt* v. *Flatbush*, 128 N. Y. 50; *Morris & Cummings Dredging Co.* v. *The Mayor*, 64 N. J. L. 587; *Sweet* v. *City of Syracuse et al.*,

129 N. Y. 316; *Diana Shooting Club* v. *Lamoreaux,* 114 Wisconsin, 44.

The act of 1865 was within the power of the assembly. The contract under which the right to occupy the streets of Chicago is derived, is a contract between the State and the specially chartered companies whose railways are held under lease. The common council had authority to act in the matter only as an agent of the State, not of the city. Its function did not extend to the making of the contract, but only to supplying certain administrative details, necessary to carry the contract into execution. Hence it appears to be impossible that any constitutional question should arise as to the power of the State to modify the State's own contract, without asking the consent of the city of Chicago.

But if the question were squarely presented as to the power of the General Assembly of Illinois in 1865 to modify a contract made by a municipality of that State, the conclusion must be in favor of the existence of the power. Chicago had no special constitutional status, such as is possessed by Denver or St. Louis. In that regard she stood on a level with the most obscure village in the State. *People* v. *Hill,* 163 Illinois, 186; *Hawthorne* v. *People,* 109 Illinois, 302; *Wilson* v. *Trustees,* 133 Illinois, 443. See also *Covington* v. *Kentucky,* 173 U. S. 231; *East Hartford* v. *Hartford Bridge Co.,* 10 How. 511; *Atkin* v. *Kansas,* 191 U. S. 207.

The act of 1865 was not meaningless. Governor Ogelsby vetoed it in 1865 on the ground that it granted an extension of franchises as we now contend. See also opinion of corporation counsel, 1871; Message of Mayor Harrison, 1883; Report Street R. R. Commission, 1900.

Though this particular act is abundantly justified as a wise exercise of legislative judgment, with the wisdom or unwisdom of the legislation the court can have no judicial concern. *Priestman* v. *United States,* 4 Dall. 28; *Everett* v. *Knells,* 2 Scott N. R. 531; *McCrusky* v. *Cromwell,* 11 N. Y. 601; *Atkin* v. *Kansas,* 191 U. S. 207.

In giving effect to the act of 1865, the only principles of interpretation are those applicable to any statute in which there is a plain declaration of the legislative purpose about a matter clearly within the competency of the legislature to decide. *City of Springfield* v. *Edwards,* 84 Illinois, 626; *Bate Refrigerating Co.* v. *Sulzberger,* 157 U. S. 1; *Fry* v. *C., B. & Q. R. Co.,* 73 Illinois, 399; *Beardstown* v. *Virginia,* 76 Illinois, 34; *Ottawa Gas Light & Coke Co.* v. *Downey,* 127 Illinois, 201; *Steere* v. *Bromwell,* 124 Illinois, 27; *McGann* v. *The People,* 97 Ill. App. 591.

It is a cardinal principle of construction that effect must be given, if possible, to all the words of the statute. *Ogden* v. *Strong,* 2 Paine, 584; *Decker* v. *Hughes,* 68 Illinois, 33, 41; *Attorney General* v. *Plank Road,* 2 Michigan, 139; *Opinion of Justices,* 22 Pick. 571; *Nichols* v. *Wells,* 2 Kentucky, 255; *Leversee* v. *Reynolds,* 13 Iowa, 310.

The words "during the life hereof" mean "during the continuance or existence of this statute as an amendatory act." *Benham* v. *Minor,* 33 Connecticut, 252. A section of a statute has or can have no life except as a part of the whole statute. It has no force or meaning or significance apart from the enacting clause. *Wheeler* v. *Chubbock,* 16 Illinois, 361; *Burritt* v. *State Contracts Comm'rs,* 120 Illinois, 322; *In re Seat of Government,* 1 Wash. T. 115; *State* v. *Patterson,* 98 N. Car. 660. No "life" can be predicated of any part of a statute, but only of the statute as a whole. The words "hereof," "herein," or "hereby," in an original statute, refer to the act itself; in an amendatory statute they refer to the original act as amended. *Lane* v. *Kolb,* 92 Alabama, 636; *Holbrook* v. *Nichol,* 36 Illinois, 161; *McKibbin* v. *Lester,* 9 Ohio St. 628; *Ely* v. *Holton,* 15 N. Y. 595.

The suggested difficulty as to the words "as made or amended" is equally devoid of substance. The word "as" may express either similarity, identity or simultaneity. It may relate to form, manner or time. Its use in the latter significance is well established and frequently recognized. *Seibert's Appeal,* 13 Pa. St. 500.

The rule is always applicable that the legislature is presumed to legislate for the future, not for the past. For this reason courts are reluctant to give statutes a retrospective operation. *White* v. *United States,* 191 U. S. 545. This rule has been frequently recognized by the Supreme Court of Illinois. *Cleary* v. *Hoobler,* 207 Illinois, 97.

Particularly is this principle applicable to a statute which expresses a general principle, as is here done by the words "all contracts," etc. To lay down a general rule and then to exclude from its operation all future cases, would be verging upon absurdity. *City Railway Co.* v. *Citizens' Railroad Co.,* 166 U. S. 565. So firmly established is this rule of construction that the courts in many cases have construed statutes prospectively, even where the legislature had apparently confined its language with intention to the past or present tense. *Amsbry* v. *Hinds,* 48 N. Y. 57; *Harvey* v. *Tyler,* 2 Wall. 328; *Railroad Co.* v. *Blackman,* 63 Illinois, 117; *People* v. *Hinrichsen,* 161 Illinois, 223; *Harris* v. *White,* 81 N. Y. 532.

The term "horse railway" is not used in the acts in the zoological sense, but in the popular sense as distinguishing such railways from steam roads.

Words in a statute which are not technical are to be taken in their common or popular acceptation, unless some special reason exists for giving them a strict interpretation. *City of Chicago* v. *Evans,* 24 Illinois, 52; *State* v. *Bridgewater Township,* 49 N. J. L. 614; *Gross* v. *Fowler,* 21 California, 393; *Schriefer* v. *Wood,* 5 Blatchf. 215; *File Sharpening Co.* v. *Parsons,* 54 Connecticut, 310; *Maillard* v. *Lawrence,* 16 How. 251. This principle has been held to apply with peculiar force to the titles of legislative acts. *Enterprise* v. *Smith,* 62 Kansas, 815; *West Plains Township* v. *Sage,* 69 Fed. Rep. 943, 950; *Little* v. *State,* 60 Nebraska, 749.

The motive power to be used by a street railway is peculiarly a subject for regulation, from time to time, by the police power of the State. The courts will not attribute to the legislature an intention to abridge or limit the police power by a

corporate charter, even assuming that such a limitation is possible. *Pearsall* v. *Great Northern R. Co.*, 161 U. S. 646, 665. See as to popular significance of the term "horse railway," *Omaha Horse-Railway Co.* v. *Cable Tramway Co.*, 30 Fed. Rep. 324, and *Paterson Ry. Co.* v. *Grundy*, 51 N. J. Eq. 213.

In Illinois steam railroads impose an additional servitude on the highway while horse railroads do not. *C., B. & Q. R. R. Co.* v. *West Chicago Street R. Co.*, 156 Illinois, 255; *Railroad Co.* v. *Hartley*, 67 Illinois, 439; *Bond* v. *Pennsylvania Co.*, 171 Illinois, 508. Neither are electric railways a burden. Cases *supra.* The conclusion so reached was in accord with the great weight of authority in other States. *Taggart* v. *Newport Street Railway Co.*, 16 R. I. 669; *Halsey* v. *Rapid Transit Street Railway Co.*, 47 N. J. Eq. 380; *Detroit City Railway Co.* v. *Mills*, 85 Michigan, 634; *Koch* v. *North Avenue R. Co.*, 75 Maryland, 222; *Buffalo &c. R. Co.* v. *Du Bois Passenger R. Co.*, 149 Pa. St. 1; *Baker* v. *Selma Street &c. R. Co.*, 130 Alabama, 474; *State ex rel. Howard* v. *Hartford Street R. Co.*, 76 Connecticut, 174. In regard to cable railways the decisions, while less numerous, are to the same effect. *Tuebner* v. *California St. R. Co.*, 66 California, 171; *Lorie* v. *North Chicago City R. Co.*, 32 Fed. Rep. 270.

The term "horse railway," as used in the charter of the city, has been construed includes railways operated by electricity. *Harvey* v. *Aurora and Geneva R. Co.*, 174 Illinois, 299; *S. C.*, 186 Illinois, 290.

The act of 1865 applied to the North Chicago City Railway Company in the same manner and with the same effect as to the other two companies referred to in the first and second sections of the act.

By all principles of statutory construction such an amendment as is contained in the act of 1865 amends all parts of the act to which it has reference, and from the time of the amendment, the former act is to be read as if it had originally been in the form fixed by the amendment. *Holbrook* v. *Nichol*, 36 Illinois, 161, 163; *Farrell* v. *State*, 54 N. J. L. 423; *Dexter &c.*

*Co.* v. *Allen,* 16 Barb. 15; *Drew* v. *West Orange,* 64 N. J. L. 483; *McKibbin* v. *Lester,* 9 Ohio St. 627; *Ely* v. *Holton,* 15 N. Y. 595.

The city has no standing to question the rulings of the Circuit Court in regard to the validity of the leases under which the complainant receivers derived title to the franchises.

There are executed contracts and whether *ultra-vires* or not titles have passed under them. Such a conveyance or lease of real or personal property, including notes and other choses in action, like a conveyance or transfer to a corporation in excess of its powers, is not absolutely void, but voidable, and passes the title, and no one can object thereto save the sovereign and, under certain conditions, the stockholders of the company. *National Bank* v. *Whitney,* 103 U. S. 99; *National Bank* v. *Matthews,* 98 U. S. 621; *Swope* v. *Leffingwell,* 105 U. S. 3; *Fritts* v. *Palmer,* 132 U. S. 282; *City of Spokane* v. *Trustees,* 60 Pac. Rep. (Wash.) 141; *Mallett* v. *Simpson,* 94 N. Car. 37; *Fayette Land Co.* v. *L. & N. R. Co.,* 93 Virginia, 274; *The Banks* v. *Poitiaux,* 3 Rand. (Va.) 136; *Land Co.* v. *Bushnell,* 11 Nebraska, 192; *Barnes* v. *Suddard,* 117 Illinois, 237; *Lancaster* v. *A. I. Co.,* 140 N. Y. 576; *Houston &c. R. Co.* v. *Shirley,* 54 Texas, 125; *Grand Gulf Bank* v. *Archer,* 8 Smed. & M. (Miss.) 151.

The act of 1865 had the effect of postponing for the extended corporate life of the Chicago West Division Railway Company the provision made by the ordinance of August 16, 1858, for terminating its occupation of certain streets, through purchase of its property by the city.

A state legislature with respect to municipal corporations has unlimited power to pass any legislation not expressly prohibited by state or Federal constitutions, and thereby to divest them of property rights and franchises conferred by the legislature and unexecuted by the city at the date of the subsequent legislation, provided only that in the case of property held upon specific trusts, the spirit and purpose of the trust be preserved. *Simon* v. *Northup,* 27 Oregon, 487; *Coyle* v. *McIn-*

*tire,* 30 Atl. Rep. 728; *Brooklyn Park Comm'rs* v. *Armstrong,* 45 N. Y. 234; *Philadelphia* v. *Fox,* 64 Pa. St. 169; *Atkin* v. *Kansas,* 191 U. S. 207; *Covington* v. *Kentucky,* 173 U. S. 231.

They can have no property rights or franchises of their own in the sense in which those words are applicable to individuals, although they may represent as trustees private rights and interests which the legislature cannot impair or destroy. *Ashby* v. *Hall,* 119 U. S. 526. As applicable to many of these points, see *Potter* v. *Collis,* 19 App. Div. N. Y. 392.

The city was bound to purchase, or provide a purchaser for, the tracks, cars, carriages, implements and appurtenances used in the operation of certain lines of railway of the Chicago West Division Railway Company before taking any steps to cause a discontinuance of the operation of said lines of railway by the company, its successors or assigns. The city is not entitled to possession until payment is made. *National Water Works Co.* v. *Kansas City,* 62 Fed. Rep. 853; *Los Angeles City Water Co.* v. *Los Angeles,* 103 Fed. Rep. 711, 734.

In accordance with the spirit of these decisions are those cases which hold that when a lessor has covenanted to pay at the end of the term for improvements made by the lessee upon the demised property, the lessee, upon breach of such covenant, may remain in possession until he receives payment. *Franklin Land Co.* v. *Card,* 84 Maine, 528; *Hopkins* v. *Gehnan,* 22 Wisconsin, 476; *S. C.,* 47 Wisconsin, 581; *Mullen* v. *Pugh,* 16 Ind. App. 337; *Van Rensselaer* v. *Penniman,* 6 Wend. 569.

The lines of the Chicago West Division Railway Company on Ogden avenue from Randolph street to Madison street, and on Randolph street from State street to Wabash avenue, were constructed with the consent and authority of the common council of the city, and as to such lines the Chicago West Division Railway Company and its lessees are vested with an unimpeachable right to maintain the same during the period prescribed by the act of 1865.

There is no provision in the acts that the designations to be made by the common council shall be by ordinance or resolu-

tion. The fact of acquiescence in the construction and public operation of such lines for a period of forty years, constitutes a designation as substantial, binding and precise as any ordinance; and raises a conclusive inference of law that such use was under sanction of proper authority. *Chicago City* v. *Robbins*, 2 Black, 418, 425; *Robbins* v. *Chicago City*, 4 Wall. 657, 679; *Gridley* v. *The City of Bloomington*, 68 Illinois, 47, 50; *Gregsten* v. *City of Chicago*, 145 Illinois, 451; *Town of New Castle* v. *Lake Erie &c. R. R. Co.*, 155 Indiana, 18; *People ex rel. &c.* v. *Cromwell*, 89 App. Div. N. Y. 291; *City Railway Co.* v. *Citizens' Street R. R. Co.*, 166 U. S. 557, 568; *Town of Bruce* v. *Dickey*, 116 Illinois, 527; *Jennings* v. *Van Schaick*, 108 N. Y. 530, 532; *Jorgensen* v. *Squires*, 144 N. Y. 280, 285; *Babbage* v. *Powers*, 130 N. Y. 281; *Donnelly* v. *City of Rochester*, 166 N. Y. 315, 318.

In any event the city is now estopped to deny the existence of a proper designation. The situation cannot be distinguished from that in *City of Chicago* v. *Stock Yards Company*, 164 Illinois, 224.

The Chicago West Division Railway Company had a contract right, under its charter, to complete the construction of its railway and to operate the same for the period prescribed by its charter, upon any route designated for it or its predecessor in title prior to May 3, 1875, upon which its railway had been partly constructed before said date, at least to the extent of prolonging such railway to its authorized terminus on the same street on which such construction had been begun.

The Illinois decisions are a unit in holding that where ordinances are not only formally accepted but actually acted upon, they become contracts which neither the State nor the city can impair without the consent of the company, save by the exercise of some reserved power. *City of Quincy* v. *Bull*, 106 Illinois, 337, 349; *Chicago Mun. Gas Light Co.* v. *Lake*, 130 Illinois, 42; *Belleville* v. *Citizens' H. Ry. Co.*, 152 Illinois, 171, 185; *The People* v. *The Chicago West Division Railway Co.*, 18 Ill. App. 125; *S. C.*, aff'd 118 Illinois. 113: *Village of*

*London Mills* v. *Telephone Circuit*, 105 Ill. App. 146, 150. See also *Louisville &c. R. Co.* v. *Bowling Green Ry. Co.*, 63 S. W. Rep. 4; *Hoodman* v. *Kansas City Horse R. R.*, 79 Missouri, 632; *Mayor* v. *Houston St. Ry. Co.*, 83 Texas, 548; *Hudson Tel. Co.* v. *Jersey City*, 49 N. J. L. 303; *Rochester &c. Water Co.* v. *Rochester Co.*, 84 App. Div. N. Y. 71; *Telephone Co.* v. *City of St. Joseph*, 121 Michigan, 502; *Northwestern Telephone Co.* v. *Minneapolis*, 81 Minnesota, 140; *City of Duluth* v. *Duluth Telephone Co.*, 84 Minnesota, 486, 492; *Abbott* v. *Duluth*, 104 Fed. Rep. 833; *City of Indianapolis* v. *Gas Company*, 104 Indiana, 107, 115.

A consent when once given by a muncipiality or an abutting owner to the use of a street for railway purposes is property within the meaning of the constitutional provision forbidding the deprivation of a person of property without due process of law. *City of Chicago* v. *Baer*, 41 Illinois, 306; *Chicago T. T. R. R. Co.* v. *Chicago*, 203 Illinois, 576, 587; *Cicero Railway Co.* v. *Chicago*, 176 Illinois, 501, 504; *Rich* v. *Chicago*, 152 Illinois, 18; *Indianapolis* v. *Consumers' Gas Co.*, 140 Indiana, 107, 113; *People* v. *O'Brien*, 111 N. Y. 1; *S. R. T. Co.* v. *Mayor*, 128 N. Y. 510, 520; *Paige* v. *Schenectady Ry. Co.*, 178 N. Y. 102, 112; *Ghee* v. *Northern Union Gas Co.*, 158 N. Y. 510, 513; *People ex rel. Woodhaven Gas Co.* v. *Deehan*, 153 N. Y. 528, 532; *Matter of Seaboard T. & T. Co.*, 68 App. Div. N. Y. 283, 285; *H. G. & C. Trac. Co.* v. *H. & L. Elec. Tran. Co.*, 69 Ohio St. 402, 410.

The words "in the city of Chicago" in the title of the act of 1859 did not render void the authority conferred in the act upon the North Chicago City Railway Company to extend its lines outside of the limits of the city of Chicago. *City of Ottawa* v. *The People ex rel.*, 48 Illinois, 233; *Prescott* v. *City of Chicago*, 60 Illinois, 123; *Binz* v. *Weber*, 81 Illinois, 288; *Cole* v. *Hall*, 103 Illinois, 30; *Timm* v. *Harrison*, 109 Illinois, 597; *McGurn* v. *Board of Education*, 133 Illinois, 122; *West Chicago Park Commissioners* v. *Sweet*, 167 Illinois, 332; *Hudnall* v. *Ham*, 172 Illinois, 76; *Bobel* v. *The People*, 173 Illinois,

23; *Park* v. *Modern Woodmen of America*, 181 Illinois, 227; *Boehm* v. *Hertz*, 182 Illinois, 156; *Village of London Mills* v. *Edward White*, 208 Illinois, 289; *Montclair* v. *Ramsdell*, 107 U. S. 155; *Detroit* v. *Detroit Citizens' St. Ry.*, 184 U. S. 368; *People* v. *Mellen*, 32 Illinois, 181; *Lockport* v. *Gaylord*, 61 Illinois, 276; *Jonesboro* v. *Cairo & St. L. R. R. Co.*, 110 U. S. 198; *People* v. *Institution of Protestant Deaconesses*, 71 Illinois, 229.

The incorporation by the act of the legislature of the town of Lake View did not deprive the North Chicago City Railway Company of its charter right to extend its street railway lines into the town of Lake View upon its streets and highways. *Chicago Municipal Gas Light Co.* v. *Town of Lake*, 130 Illinois, 54; *City of Quincy* v. *Bull et al.*, 106 Illinois, 349; *The People* v. *Blocki*, 203 Illinois, 368.

MR. JUSTICE DAY, after making the foregoing statement, delivered the opinion of the court.

The jurisdiction of the Circuit Court to render the original judgments against the companies and to maintain the ancillary bill is challenged at the outset. These objections require notice before considering the controversy upon its merits. It is insisted that the Circuit Court had no jurisdiction to render the judgments at law because of the provisions of the act of August 13, 1888, 25 Stat. 433, 434, providing that no Circuit Court shall have cognizance of any suit to recover the contents of any promissory note in favor of any assignee, or subsequent holder if such instrument be payable to bearer, unless such suit might have been prosecuted in such court to recover, if an assignment or transfer had not been made. As the notes were made payable to the order of "Markham B. Orde, Treas.," and there is no allegation that Orde was not a citizen of the State of Illinois, of which State the defendant companies were corporations and citizens, it is insisted that the jurisdiction must fail, under the provisions of the statute just referred to. Assuming without deciding that this ques-

tion could be raised by way of defense to the ancillary bill, we think the objection must fail, for under the allegations of the declaration the money was furnished directly to the defendants by the Guaranty Trust Company, and that company was the first taker of the notes. In *Falk* v. *Moebs,* 127 U. S. 597, it was held that notes made in this form, payable to the treasurer, indorsed before delivery by him, are the notes of the company. And when it appears that the indorser is not in fact an assignee of the paper, suit may be brought in a Federal court by a holder having the requisite diverse citizenship, notwithstanding the indorser might have been a citizen of the same State with the defendant. *Holmes* v. *Goldsmith,* 147 U. S. 150.

It is further argued that the entire proceedings were fraudulent and collusive; that no money was in fact loaned, and that they were the result of a conspiracy between corporations of Illinois to obtain the jurisdiction of the Federal court, and its decision on the controverted rights of the parties under the statutes of the State. We have examined the supplemental records submitted since the argument in this court, on this branch of the case, and think the charges of bad faith and conspiracy are not sustained. We have no doubt that the money was loaned by the Guaranty Trust Company to these corporations and that the original judgments were *bona fide.* As to the conspiracy to get the case into the Federal court, with a view to the decision of the rights of the parties therein, we are not aware of any principle which prevents parties having the requisite citizenship and a justiciable demand from seeking the Federal courts for redress, if such be their choice of a forum in which to have contested rights litigated. Having a proper cause of action and the requisite diversity of citizenship confers jurisdiction upon the Federal courts, and in such cases the motive of the creditor in seeking Federal jurisdiction is immaterial. *South Dakota* v. *North Carolina,* 192 U. S. 286, 310; *Dickerman* v. *Northern Trust Company,* 176 U. S. 181, 190; *Lehigh Mining and Manufacturing Com-*

*pany* v. *Kelly,* 160 U. S. 327, 336; *Crawford* v. *Neal,* 144 U. S. 585; *Cheever* v. *Wilson,* 9 Wall. 108, 123; *Smith* v. *Kernochen,* 7 How. 198, 216.

It is true that the judgments were taken and the receivers appointed on the same day, and it is quite likely that the receiverships were in view when the judgments were taken, and that preparations had been made in that direction, but we perceive in this no legal objection to the jurisdiction of the court. It is further insisted by the counsel for the city that the ancillary bills cannot be sustained upon their merits. But we think a case was made out by the allegations of the bills, especially when considered with reference to the admissions of the answer, which showed that the extent and character of the property rights of the corporations whose rights and franchises were the subjects of the receivership were in direct and serious controversy between the company and the receiver on the one hand and the city on the other. While it may be that there would have been no interference on the part of the city with the property while it was in the hands of the court's receivers, still the record shows that the city strenuously contested the asserted rights of the corporations to the franchise to use the streets of the city for ninety-nine years, the term claimed to have been granted to them by the act of February, 1865. It was the claim of the city that as to many of the ordinances granting rights in a number of the streets, the right to the use and occupancy of them would expire July 30, 1903. The city had asserted in a number of ways its purpose to treat the rights of the companies and whatever franchises they had as terminated at that date. It declared its purpose to resume possession of the streets and resort to all legal means to protect its rights against what were deemed the unfounded claims of the companies as to the extended franchises. Without going into further detail upon this branch of the case, we think that the attitude and claims of the city cast a cloud upon the title to this property which was in the hands of the receivers to be administered

under the orders of the court, and that in such case the receivers may, with the authority of the court, proceed by ancillary bill to protect the jurisdiction and right to administer the property, and to determine the validity of the claims of the parties which cast a cloud upon the franchises and rights claimed by the companies and the receivers, and that in such case it was proper to grant an injunction until the rights of the parties could be determined. *Detroit* v. *Detroit Citizens' Street Railway Co.*, 184 U. S. 368; *In re Tyler*, 149 U. S. 164; *Rouse* v. *Letcher*, 156 U. S. 47; *White* v. *Ewing*, 159 U. S. 36. We think, then, that the court had jurisdiction of the case made in the ancillary bills.

A further preliminary question is made in the contention that the leases under which the various transfers were made, and which are supposed to have vested title in the Chicago Union Traction Company, are void for want of corporate power in the companies to make or receive the same. We do not think the city of Chicago is in a position to raise that question. The corporations have undertaken to transfer the rights of the lessor companies, and the lessees have gone into possession thereof, and the same are now in possession of the receivers under authority of the court. All of the companies are parties to the suit, and the rights and franchises of all are by order of the court vested in the receivers. They hold the title to all these rights to be sold at judicial sale; or otherwise dealt with as the court may direct. In this view we cannot see that it is material to inquire into the validity of the intermediate transfers between the companies. No contract is undertaken to be enforced with the city of Chicago which depends upon the validity of these transfers. The city has no power to invalidate them, and the State has not attempted to inquire into their validity by a proceeding in *quo warranto.* In such case, we think, the principle laid down in *Fritts* v. *Palmer*, 132 U. S. 282, 293, is controlling: "The question whether a corporation having capacity to purchase and hold real estate for certain defined purposes, or in certain quantities,

has taken title to real estate for purposes not authorized by law, or in excess of the quantity permitted by its charter, concerns only the State within whose limits the property is situated. It cannot be raised collaterally by private persons unless there be something in the statute expressly or by necessary implication authorizing them to do so."

Passing now to the merits of the case, we will first notice the objection that the acts of 1859, 1861 and 1865 are unconstitutional. The Illinois constitution of 1848 contained the provision that no private or local law shall embrace more than one subject, and that shall be expressed in the title. The acts are attacked upon the ground that they are violations of this requirement. But we do not think that these objections are tenable. The title of the act of February 14, 1859, is "An act to promote the construction of horse railways in the city of Chicago;" the title of the act of February 21, 1861, is "An act to authorize the extension of horse railways in the city of Chicago;" the title of the act of February 6, 1865, is "An act concerning horse railways in the city of Chicago." In *People* v. *People's Gas Light Company,* 205 Illinois, 482, the Illinois cases were reviewed and the conclusion reached that the purpose of the constitutional provision is accomplished if the title is comprehensive enough as reasonably to include within the general subject or the subordinate branches thereof, the several objects which the statute seeks to effect. And it was held that the generality of the title is no objection to a law so long as it is not made to cover legislation incongruous in itself and which by no fair intendment can be included as having necessary or proper connection. In the case of *Montclair* v. *Ramsdell,* 107 U. S. 147, a statute of New Jersey was before this court which was claimed to be unconstitutional, because it embraced more than one subject, not expressed in its title. The provision of the New Jersey constitution was "To avoid improper influences which may result from intermixing in one and the same act, such things as have no proper relation to each other, every law shall embrace but one object,

and that shall be expressed in the title." The *Montclair* case held: 1. That this provision does not require the title of an act to set forth a detailed statement or an index or abstract of its contents; nor does it prevent uniting in the same act numerous provisions having one general object fairly indicated by its title. 2. That the powers, however varied and extended, which a township may exercise, constitute but one object, which is fairly expressed in a title showing nothing more than the legislative purpose to establish such township. In the late case of *Detroit* v. *Detroit Citizens' Street Railway Company*, 184 U. S. 368, the court had occasion to deal with a similar provision in the constitution of Michigan. In it the language of Judge Cooley in *People ex rel. Secretary of State* v. *State Insurance Company*, 19 Michigan, 392, was quoted with approval: "We must give the constitutional provision a reasonable construction and effect. The constitution requires no law to embrace more than one object, which shall be expressed in its title. Now the object may be very comprehensive and still be without objection, and the one before us is of that character. But it is by no means essential that every end and means necessary or convenient for the accomplishment of the general object should be either referred to or necessarily indicated by the title. All that can reasonably be required is, that the title shall not be made to cover legislation incongruous in itself, and which by no fair intendment can be considered as having a necessary or proper connection." Applying this principle, we do not think that any of the subjects treated were so far foreign to the title of the several acts as to be open to this constitutional objection. See, also, upon this subject: *Ackley School District* v. *Hall*, 113 U. S. 135, 141; *Jonesboro City* v. *Cairo & St. L. R. R. Co.*, 110 U. S. 192, 198; *Otoe County* v. *Baldwin*, 111 U. S. 1; *Mahomet* v. *Quackenbush*, 117 U. S. 508; *Carter County* v. *Sinton*, 120 U. S. 517.

Without taking time to analyze the acts in this connection we pass to what we deem more important features of the case.

The principal controversy in this case turns upon the con-

struction of the act of 1865, amending the act of 1859.   On the part of the companies it is insisted that this act means to give an irrevocable grant from the State of the right to use the streets of the city of Chicago for street railway purposes for a term of ninety-nine years from the passage of the law; that the only right conferred upon the city is one of designation of the streets to be occupied and the regulation by agreement with the companies of what are termed the "administrative" features of the occupancy.   It is insisted that this broad right is derived from the public act of the state legislature, which, upon its acceptance, has become an inviolable contract between the State and the companies.   Upon the part of the city it is contended that there has been no grant to the railways to occupy the streets of the city except with the authorization of the city council and upon such terms and conditions, including the term of occupancy, as that body may see fit to fix by contract with the companies; that the only legitimate effect of the act of 1865, other than the extension of the corporate life of the companies, has been to continue the control of the city over the streets, and to reaffirm the contracts theretofore made between the city and the companies.   The theory that the franchise to use the streets was derived solely from the State, subject only to the right of the city to designate the streets to be occupied, and to regulate the "administrative" features of the use, was adopted by the learned Circuit Court in construing the act in controversy.   It is therefore important to consider the nature of the franchises, licenses, rights and privileges, dealt with in the act of 1865, to ascertain, as near as may be, in what sense its terms were used, and with what meaning they are incorporated into the act.   In order to construe this act and determine, if possible, its true meaning and the extent of the powers and rights intended to be granted or confirmed, reference may appropriately be had to prior legislation upon the subject, for the act of 1865 is amendatory and can only be understood if a correct apprehension is first had of the powers previously granted, and the extent and nature of the rights and

privileges conferred and the sources from which they severally came.   Whether the city charter, granted while the constitution of 1848 was in force, gave the city the right to grant to railway companies the privilege of using the streets for street railway purposes is a question much discussed in the briefs and the arguments at bar.   The city, by the charter of 1851 and the amendment of 1863, had general power to control the use and occupation of the streets of the city and to regulate the use of horse railways therein and the laying of tracks thereon.   It is insisted for the city that, independent of the acts under consideration in this case, the general powers conferred in the city charter, as construed by the Supreme Court of Illinois, were broad enough to empower it to grant the use of the streets for street railway purposes.   See *City of Quincy* v. *Bull et al.,* 106 Illinois, 337, 349, and cases cited in the opinion.   On the part of the companies it is contended that this right could only come from the State, and that the effect of the act in question was to confer the right upon the companies as a charter right granted by the sovereign power.

It is said to have been the settled understanding of all concerned, and in accordance with the then existing policy of the State, that the act of 1859 was a franchise directly granted by the State, giving the full right to use the streets of the city for the term of the corporate life of the companies, subject only to the designating power of the city as to streets to be used. In this connection it may be observed that the Supreme Court of Illinois in *Chicago Union Traction Company* v. *City of Chicago,* 199 Illinois, 484, 525, distinctly stated that the act of 1859 recognized the power of the common council to pass the ordinance of August 16, 1858.   "There," it is said in the opinion, "was no other action of the common council, taken before the passage of the act of February 14, 1859, except the ordinance of August 16, 1858.   By the use of the words, 'with such rights and privileges as the said common council has prescribed,' the legislature could not have referred to any other action of the common council than the passage of the ordinance

of August 16, 1858. It thereby recognized the power of the common council to pass that ordinance, and the appellant here introduces it and relies upon it. The legislature, by thereby affirming and recognizing the passage of the ordinance of August 16, 1858, also recognized the power of the common council to pass that ordinance under clause nine of section four of chapter four, of the charter of 1851." In the act of 1859 the legislature did not assume to fix independently the term for the use of the streets, but affirmed that which the common council had authorized the corporators to do, and gave authority to confer future rights by agreement with the corporations. In the first grants after the passage of the act of February 14, 1859, those of May 23, 1859, to the Chicago City Railway Company and the North Chicago City Railway Company, as we shall have occasion to show later, so far from acting upon the theory that the State had granted to the corporations the full right to use the streets for the corporate life of the companies and needed no permission from the city council other than such as designated the streets and regulated administrative features, the council made and the companies accepted the ordinances which on the north side were for the term of twenty-five years and no longer, and on the south and west sides for the term named in the act of 1859, which had affirmed the grant from the council in the ordinance of 1858. The south and west side ordinance, as its recitals show, was not only passed in pursuance of the act of February 14, 1859, but also by virtue of the power and authority otherwise vested in the common council by its charter. *Union Traction Co. v. City of Chicago*, 199 Illinois, 484, 525. Thereafter and frequently until the passage of the act of 1865, the council made and the companies accepted specific ordinances fixing the time of occupancy, as had been done in the original ordinances of May 23, 1859. And neither before nor after the passage of the act of 1865 was the ninety-nine year term recognized or acted upon in ordinances granting the use of the streets.

Under the ordinance of 1858 the council undertook to au-

thorize the persons named to lay and operate a horse railway in certain streets of the city. This right, by the terms of the ordinance, was granted for the period of twenty-five years, and until the common council, in the manner designated, should elect to purchase and pay for the property of the railway companies. If this ordinance had been without legislative authority previous to the act of February 14, 1859, that act constituted the persons named in the ordinance of 1858, with one other, and their successors, a body politic and corporate under the name of the Chicago City Railway Company, for the term of twenty-five years, with all the powers incident to such corporations. The corporation was authorized to construct, maintain and operate a single or double track railway in the city of Chicago, within the present or future limits of the south or west divisions of the city. But the grant did not stop there. It was immediately qualified and limited by the authority given to the common council of the city, for it provided that this right to maintain and operate street railways was upon streets, etc., "as the common council of said city have authorized said corporators, or any of them, or shall authorize said corporation so to do in such manner and upon such terms and condition, and with such rights and privileges, as the common council has or may by contract with said parties, or any or either of them, prescribe." The corporation was given the right of eminent domain. Then as to the action of the city, already taken under the ordinance of 1858, by section 7, all of the rights and privileges granted or intended so to be, to the incorporators and their associates by the ordinances and amendments thereto passed by the council were approved and vested in the corporation. By section 10 of the act the North Chicago City Railway Company was incorporated. Is this act consistent with the theory that the full franchise of occupying and using the streets, without regard to authority from the city, except in designating streets, was vested by the State in the companies incorporated? This act conferred upon the railway companies, it is true, the right to use and occupy

the streets of the city, but this right was upon the terms prescribed in the law. Conceding the plenary power of the legislature over the subject at that time, and that franchises, broadly speaking, are rights and privileges conferred by the State, and are derived from a grant of the sovereign power, nevertheless the State while exercising its authority might give to the city such measure of right and control in the matter as it saw fit. Dillon on Munic. Corps., 3d ed., § 705; Railroad Co. v. Richmond, 96 U. S. 521. The city is the corporate body directly interested in the use and control of the streets. By the charter of 1851 exclusive control over the streets was given to the council. That it was the intention of the legislature to give effect to the right of municipal control in the act under consideration is shown in its confirmation of terms already fixed by contract between the city and the companies. As to the future, companies were to have no right to the use and occupancy of the streets until they should obtain from the city council authority to that end, under contracts to be agreed upon as to terms and conditions. A more comprehensive plan of securing the city in the control of the use of the streets for railway purposes could hardly be devised. The company must be "authorized" by the city council before it can lay tracks or operate railways in the streets. This is more than to designate that for which authority has already been given. To authorize is to "clothe with authority," Webster's Dict.; "To give legal power to," Century Dict. It is an additional grant of right and power which the legislature requires the corporation to obtain as a condition precedent to its use and occupation of the streets. This power of the city, in the absence of language in the statute, excluding the authority and reserving its exercise to the State, necessarily includes the right to fix the time for which the streets may be used. This doctrine was, we think, correctly stated by Judge Lurton, in delivering the opinion of the Court of Appeals in Louisville Trust Company v. Cincinnati, 76 Fed. Rep. 296, 308. "The right of the local authority to impose terms and conditions is

clearly conferred, and no such corporation can impose itself upon the public streets or highways unless it enters into an agreement touching the occupancy of such streets, or resorts to the right of condemnation in default of an agreement. This right to impose terms and conditions most obviously implies the right to agree upon the duration of such occupancy. The right to exclude altogether, unless resort be had to condemnation, involves the right to limit the period of the grant." *Coverdale* v. *Edwards*, 155 Indiana, 374, 381; Elliott on Railroads, § 1081.

The act under consideration nowhere assumes to fix the duration of the grant, nor excludes the conclusion that it is embraced in the terms and conditions which are to be fixed by contract with the city. If the franchise to use the streets, without regard to municipal action, was fully conferred by the legislative act under consideration, then the company had only to take possession of the streets, subject to regulations as to running of cars, etc., by the city council. On the contrary, under the terms of this act, the city, by withholding its consent, could prevent the use of the streets by the corporations. No way is pointed out by which this consent could be compelled against the will of the council. That body might, for reasons sufficient to itself, under the terms of this act, by withholding assent, determine that it was undesirable to have the corporations in control of the use of the streets.

While the decisions of the Supreme Court of the State are not binding upon us in determining whether a contract was made which is entitled to protection under the Federal Constitution, we may notice the case of *Chicago City Railway Company* v. *People ex rel. Story*, 73 Illinois, 541. That was a proceeding in *quo warranto* against the Chicago City Railway Company, asking to declare a forfeiture of its franchise to operate upon a portion of Indiana avenue. The grounds relied upon were that the railway company had not obtained the consent of two-thirds of the owners of the property fronting on the avenue within fifteen months from the passage of the

ordinance of August 22, 1864, the time limited for construction in the ordinance of that date. The respondent, the Chicago City Railway Company, relied upon an ordinance passed November 13, 1871, amendatory of the ordinance of August 22, 1864, extending the time to complete its railway for a period of two years from the date of the last-named ordinance. The court found that two-thirds of the property owners had consented, as provided in the ordinance of August 22, 1864, but found that the company had neglected to construct its road to the city limits within fifteen months from the passage of the ordinance, as therein provided. The question turned upon the validity of the extending ordinance of November 13, 1871, passed after the constitution of 1870 went into effect. The majority of the court—Chief Justice Walker and Justices Breese and Sheldon dissenting—held that the common council had authority under the act of 1865 to extend the time for the building of the roads on Indiana avenue, as the time limitation was a provision in favor of the city, which it might waive, as the charter of the company was silent upon the time within which the railway might be constructed, and in this connection held that the right granted by the city to construct the railway was a license as distinguished from a franchise derivable from the State, and, therefore, not within the constitutional prohibition against the passage of local or special laws granting to any corporation, association or individual the right to lay down railroad tracks, or amending existing charters for that purpose, or granting to any corporation, association or individual any special or exclusive privilege, immunity or franchise whatever. The minority of the court were of opinion that the constitution of 1870 made the extending ordinance invalid. In neither the majority nor the dissenting opinions is there any intimation that the railway company could occupy or use a street of the city of Chicago without the permission of the city. In discussing how far the charter authorized the company to act without the consent of the city, Mr. Justice Sheldon, in the course of an able dissenting opinion, concurred in by the Chief

Justice and Mr. Justice Breese, is careful to point out that the
right to occupy the streets is not complete in the grant of the
charter from the State, and is only capable of being exercised
when supplemented by the authorization of the city. And see
*People's Railroad* v. *Memphis Railroad,* 10 Wall. 38, 55. In
that case this court held that a charter authorizing a street
railroad company to operate street railroads in all the streets
of the city "with the consent of the city" was unavailing until
the consent of the city was first had, which consent was a con-
dition precedent to the use of the streets.

What, then, was conferred in the franchise granted by the
State? It was the right to be a corporation for the period
named, and to acquire from the city the right to use the streets
upon contract terms and conditions to be agreed upon. The
franchise conferred by the State is of no practical value until
supplemented by the consent and authority of the council of
the city. After the passage of the act of 1859 the common
council of the city on May 23, 1859, passed an ordinance au-
thorizing the extension and operation of certain horse rail-
ways in the streets of the south and west divisions of the city,
and granting the use thereof to the Chicago City Railway
Company. The city purported to act under authority of the
act of 1859, and by virtue of the powers and authority other-
wise vested in the common council by law. By this ordinance
the term of use and occupation was fixed at "during all the
term in the said act of the fourteenth of February, A. D. 1859,
specified and prescribed." On the same day the council passed
an ordinance granting rights in certain streets to the North
Chicago City Railway Company. This ordinance contained
this language: "The rights and privileges granted to the said
company by this ordinance, or intended to be, shall continue
and be in force for the benefit of said company for the full
term of twenty-five years from the passage of this ordinance,
and no longer." On February 21, 1861, the legislature passed
an act incorporating the Chicago West Division Railway Com-
pany for the term of twenty-five years, the corporation to pos-

sess the powers enumerated in the second, third, fifth and sixth sections of the act of February 14, 1859. By section 4 of the act the corporation was authorized to acquire from the Chicago City Railway Company the powers, franchises, privileges and immunities conferred upon that company, and the consent of the directors of said company was made a condition precedent to the exercise of the powers conferred as to any streets of the south and west divisions of the city of Chicago.

Before the passage of the act of 1865 a number of ordinances were passed, conferring the privilege of using streets, in most cases with a time limit definite in character. The record discloses that by an agreement of July 29, 1863, the Chicago City Railway Company had agreed to convey to the Chicago West Division Railway Company certain rolling stock, equipment, etc., together with "all and singular the franchises, rights, privileges and immunities" of the Chicago City Railway Company in and upon certain streets, "conferred, given or granted by or under any or all acts of the General Assembly of the State of Illinois, and any and all ordinances of the city of Chicago or contracts with the common council." In this contract it was also provided that if at any time it should be adjudged that consent to the sale by the council of the city of Chicago is, or was, necessary to secure to the grantee company the rights and privileges embraced in the contract, the grantor company would do all in its power by reasonable and proper effort to secure such consent of the common council. By the deed of transfer of July 30, 1863, the grantor company conveyed its rights, privileges and franchises in the use and occupation of certain streets, "to have and to hold the above bargained and granted premises and property to the party of the second part, etc., for and during all the time which the said party of the first part might hold, exercise and enjoy the same under its present charter and any and all extensions thereof." On December 13, 1859, the Chicago City Railway Company by agreement gave to the North Chicago City Railway Company permission and authority to make, construct and use for

twenty-four years, tracks, etc., as might be necessary to extend its railway southerly to such points in the south and west divisions along certain streets, "as the party of the first part (Chicago City Railway Company) has been or may be authorized to make and have the same."

It thus clearly appears, at least up to the passage of the act of 1865, that legislation upon the subject recognized and enforced the right and authority of the city to fix the term during which the streets might be occupied by street railway companies. The legislature had confirmed the ordinance of the city fixing the term at twenty-five years and until the city should see fit to purchase the property of the railway company. It had required the companies to obtain the authority of the city before using the streets, such use to be upon terms and conditions, and with such rights and privileges as the city had or might thereafter prescribe by contract with the companies.

We find no intention evidenced in legislative action thus far to prevent the municipal authorities from exercising the important and far-reaching authority of fixing by contract with the persons or corporations to whom franchises are granted by the State the term during which the occupancy shall continue. This feature of the right to use the streets, it need hardly be said, is of most vital importance to both parties. Some latitude of time is essential to the value and stability of the investment to be made. An unduly long period might conclude municipal action when changing conditions and growing population demanded it in the public interest.

We come now to the act of 1865. Does its interpretation justify the contention that by its terms the State took from the local authorities the control which had been theretofore recognized, the right and authority to determine upon what terms and for what length of time the railways might occupy the streets, and without other consideration than the building, equipment and operation of the roads, conferred upon the companies the right to use and occupy for ninety-nine years to

come the streets of the city which might thereafter be designated by the city council, and confirmed without qualification for that term the right to use and occupy the streets covered in contracts already made with the city? We may premise, before taking up this act for more detailed consideration, that it is a firmly established rule, which we shall have occasion to refer to later on in this discussion, but which must be borne in mind as we enter upon the consideration of this act, that one who asserts private rights in public property under grants of the character of those under consideration, must, if he would establish them, come prepared to show that they have been conferred in plain terms, for nothing passes by the grant except it be clearly stated or necessarily implied. The first section of the act of 1865 was effectual to extend the corporate life of the two companies, created by the acts of 1859 and 1861, from twenty-five to ninety-nine years each. The second section authorizes the construction and maintenance of street railways in the city of Chicago upon such streets, etc., within the limits named, as the common council have authorized or shall from time to time authorize, the rights, privileges and immunities and exemptions to be such as the common council has prescribed or may by contracts with said parties, or either of them, prescribe. In the first clause of that section, then, there is shown no disposition to depart from the policy of the State as indicated by the act of 1859, and the action of the companies thereunder, which required the street railway companies before entering upon the occupation or use of the streets to obtain by agreement with the city its sanction and authority for the right and privilege of so doing. Then comes the clause, which it is contended, works a revolution of former policies and extends former franchises and rights to the full term of ninety-nine years, and withholds from the city the power of granting any further use of the streets to the railway companies, except upon terms of extending the right for the like period. While we have no right to consider this act by segregating its clauses as though they were separate enact-

ments, for the purpose of having its provisions clearly in view,
we insert this clause:

". . . and any and all acts or deeds of transfer of rights,
privileges or franchises between the corporations in said several
acts named, or any two of them, and all contracts, stipula-
tions, licenses and undertakings, made, entered into or given,
and as made or amended by and between the said common
council and any one or more of the said corporations, respecting
the location, use or exclusion of railways in or upon the streets,
or any of them, of said city, shall be deemed and held and
continued in force during the life hereof, as valid and effectual,
to all intents and purposes, as if made a part, and the same are
hereby made a part of said several acts."

Does a fair interpretation of this clause of the act ex-
tend all the franchises, privileges and contracts theretofore
made for the term of ninety-nine years? This clause deals
with:

1. The transfers of rights, privileges or franchises between
the corporations.

2. Comprehensively speaking, the contracts made between
the city and the companies.

The definition of "rights and privileges," as the terms are
used in this act, is not difficult to find. It is contained in the
context of the act confirming "such rights and privileges, im-
munities and exemptions, as the common council has [pre-
scribed], or may by contract with said parties, or any or either
of them, prescribe." This definition conforms to the use of
the terms in prior acts of the legislature on the subject as well
as to ordinances of the city granting the use of the streets.
The rights and privileges intended are such as have been de-
rived from contracts with the city. Franchises in the sense
we have stated have been the grants of the State. Licenses
and all other privileges have been obtained from the city, act-
ing under the authority of the acts of the legislature in the
manner outlined earlier in this discussion. As to the deeds
and acts of transfer of rights, privileges and franchises, as well

as the contract rights secured from the city, the act declares. they "shall be deemed and held and continued in force during the life hereof, as valid and effectual, to all intents and purposes, as if made a part, and the same are hereby made a part of said several acts."

What does this mean? It cannot operate to extend the contract rights and privileges, obtained directly from the city before or after the transfer by one company to the other, ninety-nine years, for as to these the act distinctly declares that the contracts, stipulations, licenses and undertakings, between the council and the companies shall stand "as made or amended." This declaration is in the past tense, and can have no reference by any fair construction to future engagements.

The contracts by this clause in all their terms, including time limits, are written into the original acts of 1859 and 1861, as if made a part thereof. Much discussion has been had as to the proper interpretation of the ambiguous expression "during the life hereof." For the companies it is insisted that its meaning is to extend all franchises and contracts, and whether the latter have been or may thereafter be made to the end of the ninety-nine years, so as to give the railways the franchise to use the streets for that period by an irrevocable grant, irrespective of any limitations by state or municipal action subsequently undertaken. To give this act the construction insisted on by the companies is inconsistent with the policy of the State, declared in the act of 1859, which ratified the ordinance of 1858, and gave additional rights in the streets only upon obtaining the consent of the city. It practically reads out of the act the preceding clause of the very section under consideration, which expressly recognizes the authority of the city council to control the use of the streets by contracts which it has made or may make in the future. To say that contracts, the terms and conditions of which are left to agreement with the city, could only be made upon terms of extension to ninety-nine years, is to nullify in an important partic-

ular the powers conferred in the act. The construction contended for requires us to ignore or entirely change the sense of terms establishing the contracts as made, and requires an interpretation which applies to the future what is specifically stated to be meant for the past. It does violence to the rule contended for by counsel for the companies; that words are to be considered in their ordinary signification, and every part of the statute, if practicable, given meaning in harmony with its other provisions upon the subject. It is urged that the words "as made or amended" must have reference to the future, and were intended to give a prospective operation to the act and to read into all contracts thereafter to be made, as well as theretofore made, a right to use the streets without the consent of the city for the extended period. And it is said that this is particularly shown by the use of the words "as amended." But this expression was used in the seventh paragraph of the act of 1859, vesting in the corporations the rights and privileges granted by the ordinances of the common council "and the amendments thereto." The ordinance of August 16, 1858, was itself an amendment of prior municipal legislation. The purpose of the act of 1865 was to continue, as made, the former contracts, with their amendments. If it was intended to extend all past contracts and licenses for the use of the streets to the term of ninety-nine years, and to require the city council to enter into no new engagements for terms and conditions which should not extend to that period, it would have been easy to give expression to such purpose in plain words, and not resort to language which, as stated in one of the briefs of the learned counsel for the companies, is "unusual and more or less figurative." If the words used have no effect to control the right of future contract, but do extend the term of the contracts made to ninety-nine years, then we may have the anomalous situation of some contracts for short and some for long terms in the same system of railroads. It is true that we are to consider the situation as it was when the act was passed, and not in the light of the subsequent growth and development

of the city. But in 1865 the policy of local control of the streets for railway purposes had been declared and acted upon. So radical a departure as is contended for must be found in terms plainly stated and clearly defined. It is contended that unless the construction insisted upon for the companies is given to the act, no force or effect is given to the expression "during the life hereof," and a well-recognized rule is invoked that all parts of this law must be given force and effect in interpreting its meaning. While it is incumbent upon those claiming under a public grant, as we have already stated, to make out the rights contended for by terms which clearly and unequivocally convey them, and it is enough to deny the privileges contended for, if, upon considering the act, the mind rests in doubt and uncertainty as to whether they are intended to be conferred, we think this act can be given a construction which shall give some meaning and effect to the words "during the life hereof." Literally construed, the phrase would mean for the life of the act. It has been suggested that it may mean until the corporations, by forfeiture or otherwise, go out of existence. But these meanings do not seem to aid the purpose manifested in the law, and meaningless phrases are not supposed to be used to express the legislative will. Bearing in mind that the franchises granted came from the State, the nature and extent of the rights included in those franchises, that the franchise to be a corporation was extended by the first section of the act, and that the franchise, the transfer of which was intended to be confirmed in the clause now before us, embraced the right granted by the State to use the streets with the authority of the city, and that the rights and privileges were obtained from the city, let us see if some meaning can be found consistent with the other parts of the act, and recognized rules of construction. Conceding for this purpose the contention on behalf of the companies that the phrase, "during the life hereof," may mean for the term of ninety-nine years, for that period the act provides that certain things "shall be deemed and held and continued in force." What

are they?   1. "Any and all acts or deeds of transfer of rights, privileges or franchises between the corporations in said several acts named or any two of them."   2. "All contracts, stipulations, licenses and undertakings, made, entered into, or given, and as made or amended by and between the said common council and any one or more of the said corporations, respecting the location, use or exclusion of the railways in or upon the streets or any of them of said city."   The context of the act, as we have seen, defines rights and privileges to be such as are derived from the contracts with the city. It recognizes, as do the ordinances previously passed, in the use made of the same phrase, that the city is the source from whence they came.   Franchises, as we have said, came from the State. The phrase, "during the life hereof," cannot be held to extend contract rights to ninety-nine years without doing violence to the terms which just precede this phrase and are found in the same sentence, confirming all contracts, stipulations, licenses and undertakings "as made or amended."   The vital part of such contracts is the duration of the occupancy of the streets, expressly limited to twenty-five years, and in some cases twenty-five years and until purchase by the city.   To say that "during the life hereof," in the sense that it means ninety-nine years, is to be the life of the contracts, permits that part of the sentence to repeal the provision of the clause which reads them into the original act in all respects as made or amended.   Rejecting, therefore, such impossible construction as doing violence to the very terms of the law, there is only left of the things provided for which can be consistently extended for ninety-nine years, the acts or deeds of transfer between the corporations so far as they relate to franchises which are not subject to the express limitations of the act— that they shall stand as made.   These franchises as conveyed were necessarily limited to twenty-five years, the then life of the companies.   The first part of this act has prolonged the corporate life to ninety-nine years.   In the sense which we have already defined the franchise granted by the State, as

conferring the right to use and occupy the streets with permission from the city, the act may be consistently held to extend and validate the deeds of transfer as conveying a continued right to such franchise for the extended period of the lives of the corporations. This construction gives some weight and force to this ambiguous expression, and, taking the entire act together, is more consistent with the legislative purpose expressed than is the one put forward, which ignores the reference to the contracts in their original form and extends them all for ninety-nine years, while the act declares they shall not be disturbed as made. It is not to be understood that the interpretation herein suggested frees the judicial mind from doubt as to the meaning of this act, any more than its ambiguous and contradictory phrases could have impressed upon the legislative understanding the meaning now contended for by the companies. It is the application of the settled rule of interpretation to such grants which invalidates the claims made for it, rather than any clear and satisfactory interpretation which has been suggested by counsel or arrived at by the court.

This construction is in harmony with the policy of the State, as evidenced in its prior legislation on the subject, and in the earlier part of the section under consideration, it gives some meaning to all parts of the act, and makes its provisions consistent with each other. It preserves local control of streets for railway purposes, which the legislature in all of the acts under consideration has sought to protect. Considering the act as a whole, it has the effect to extend the life of the corporations to ninety-nine years and to authorize the use of the streets of Chicago, with the consent and upon terms agreed upon with the council, and this right may be acquired in like manner during the extended life of the corporations for such periods as may be contracted for. Contracts already made are affirmed as made. The transfers between the companies are validated.

Further contracts may be entered into and amendments made without resort to new legislation empowering the cor-

porations, as the right of amendment is given, reserving the right of modification or repeal, by a majority of the aldermen elected or act of the General Assembly, of the right to charge a higher rate than five cents.

While it is true that if by the act the State had conferred a grant of the right to use the streets for the period of ninety-nine years, entitled to the protection of the contract clause of the Constitution, such right could not be impaired by any subsequent legislation, it is worthy of note, as showing the continuous legislative policy of the State, that in the act of March, 1867, amending the charter of the city of Chicago, it was provided that no grant of the right to use the streets should be given, or those already given extended, unless by a vote of three-fourths of all the aldermen elected, and that no grant, consent or permission theretofore given or made, or thereafter given, should in any case be extended until within one year of the expiration of the grant, consent or permission, and in case of veto by the mayor such grant or permission should receive the vote of three-fourths of all the aldermen. This act shows a consistent policy of local control, and is inconsistent with the theory of a grant already made for the use of the streets for ninety-nine years.

In reaching the conclusions herein stated as to the proper construction of the act of 1865, amending the act of 1859, we are not unmindful of the fact that much can be said in favor of the view contended for by the learned counsel for the companies. The construction of this act, as we have said, is by no means free from difficulty.

It is true that Governor Oglesby in his message returning this act with his veto gave it a construction which would maintain the right to use the streets for the period of ninety-nine years. While his construction was assumed rather than demonstrated, and the stress of his argument was upon the impropriety and constitutional invalidity of thus postponing the right of the city to purchase, it may be admitted that his interpretation of the act sustains the view contended for by

the companies. But, as we have said, the act upon its face is ambiguous and uncertain. We must judge of it by the terms in which it is expressed. A construction can be given it which would extend all the contracts with the city for the term of ninety-nine years. On the other hand, it can be maintained, with at least equal force, that, notwithstanding the Governor's view, it affirmed the contracts as made, thus distinctly recognizing the comparatively short term of twenty-five years, for which they expressly stipulated. It must be, therefore, uncertain whether the legislators voted for this act upon one construction or the other. It may be that the very ambiguity of the act was the means of securing its passage. Legislative grants of this character should be in such unequivocal form of expression that the legislative mind may be distinctly impressed with their character and import, in order that the privileges may be intelligently granted or purposely withheld. It is matter of common knowledge that grants of this character are usually prepared by those interested in them, and submitted to the legislature with a view to obtain from such bodies the most liberal grant of privileges which they are willing to give. This is one among many reasons why they are to be strictly construed. Pierce on Railroads, 491; *New Orleans &c Railroad Co.* v. *City of New Orleans,* 34 La. Ann. 429, 447. "Words of equivocal import," said Mr. Chief Justice Black, in *Pennsylvania Railroad Company* v. *Canal Commissioners,* 21 Pa. St. 9, 22, "are so easily inserted by mistake or fraud that every consideration of justice and policy requires that they should be treated as nugatory when they do find their way into the enactments of the legislature." "The just presumption," says Cooley in his work on Constitutional Limitations, 7th ed. p. 565, "in every such case is that the State has granted in express terms all that it designed to grant at all;" and, after quoting from the Supreme Court of Pennsylvania to the same effect, the learned author observes: "This is sound doctrine, and should be vigilantly observed and enforced."

Since the decision of the *Dartmouth College Case,* 4 Wheat

518, this court has had frequent occasion to apply and enforce the doctrine that a grant of rights in public property accepted by the beneficiary will amount to a contract entitled to protection against impairment by action of the State or municipalities acting under state authority. Concurrent with this principle and to be considered when construing an alleged grant of this character is the equally well established rule, which requires such grants to be made in plain terms in order to convey private rights in respect to public property, and to prevent future control of such privileges in the public interest. The rule was laid down with clearness by Chief Justice Taney in the often-cited case of *Charles River Bridge* v. *Warren Bridge,* 11 Pet. 420, and has been uniformly applied in many subsequent cases in this court. In *Perrine* v. *Chesapeake & Delaware Canal Company,* 9 How. 172, 192, the same eminent Chief Justice, speaking for the court, said: "The rule of construction in cases of this description . . . is this,—that any ambiguity in the terms of the grant must operate against the corporation and in favor of the public, and the corporation can claim nothing that is not clearly given by the law. We do not mean to say that the charter is to receive a strained or unusual construction, contrary to the obvious intention of the grant. It must be fairly examined and considered, and reasonably and justly expounded." In the case of *The Binghamton Bridge,* 3 Wall. 51, 75, it was said: "The principle is this, that all rights which are asserted against the State must be clearly defined, and not raised by inference or presumption; and if the charter is silent about a power, it does not exist. If, on a fair reading of the instrument, reasonable doubts arise as to the proper interpretation to be given to it, those doubts are to be solved in favor of the State; and where it is susceptible of two meanings, the one restricting and the other extending the powers of the corporation, that construction is to be adopted which works the least harm to the State."

This principle has been declared axiomatic as a doctrine of this court. *Fertilizing Company* v. *Hyde Park,* 97 U. S. 659,

666. In *Slidell* v. *Grandjean*, 111 U. S. 412, 438, it is declared a wise doctrine, "it serves to defeat any purpose concealed by the skillful use of terms, to accomplish something not apparent on the face of the act, and thus sanctions only open dealing with legislative bodies." Among other cases affirming the principle in this court is *Coosaw Mining Company* v. *South Carolina*, 144 U. S. 550, in which it was applied in adopting, of two doubtful constructions, the one more favorable to the State. Many of the cases are cited in a note to *Knoxville Water Company* v. *Knoxville*, decided at this term. 200 U. S. 22, 34. Applying the principle so frequently asserted and uniformly maintained, we think it cannot be successfully maintained that the act of 1865 contains a clear expression of legislative intention to extend the franchise of these companies to use the streets of Chicago, without reference to the assent of the city, for the long term of ninety-nine years, and for that time preventing other and different legislation restricting this grant of a practically exclusive right. So enormous a grant of privileges, including an exclusion from some streets of any railway system, ought not to be presumed or held to be conferred in doubtful and ambiguous words. Grants of this character are not to be destroyed by an unreasonable or narrow interpretation. But if ambiguity is fatal to such claim of rights as against the public, for the stronger reason must such grants of far-reaching and exclusive privileges as are here asserted, fail when they can only be maintained by strained construction in their favor.

The effect of the act of 1865 was to affirm the contracts as made between the council and the companies; these contracts must stand as concluded, unless changed by subsequent agreement between the parties. As we have said, the principal question in the case concerns the construction of the act of February 14, 1859, as amended by the act of February 6, 1865. The learned Circuit Court, holding the opinion that the right to use the streets was extended for the prolonged term of the corporate life of the companies, also held that the adoption of

the Cities and Villages Act by the city of Chicago, in May, 1875, which act was passed under the constitution of Illinois, taking effect in 1870, put an end to the right of the city of Chicago to thereafter designate streets under the former acts, and that contracts subsequently made were subject to the limitation of twenty years, as provided in the Cities and Villages Act of 1872. The court applied the principles upon which it construed the acts in question, and gave it effect as to numerous streets which were the subject of contracts between the city and the companies. Under our conclusions the decree must be reversed, and the construction we have given the act may require a decree differing from that rendered in the Circuit Court, when applied to particular streets. But we shall not take up all these controversies in detail and shall leave to the Circuit Court a readjustment of the decree upon the lines of this opinion. There are, however, certain matters in the case which have been fully argued and should be determined before the case is again considered in the Circuit Court. On these features of the case we will not enter upon extended discussion, but briefly indicate our views upon them.

It was held by the learned Circuit Court that the amending act of 1865 had application to the North Chicago City Railway Company, and had the effect to extend the corporate life of that company. We think this is a correct view. By the tenth section of the act of 1859 all the grants, powers, privileges, immunities and franchises conferred upon Parmalee and others, by the act for the south and west divisions of the city of Chicago, were conferred upon certain persons by the corporate name of the North Chicago City Railway Company, for the north division of the city, in the county of Cook, as fully and effectually as if they had been by a separate act incorporated, with all of said grants, powers, immunities, privileges and franchises. By the first section of the act of 1865 the corporate lives of the Chicago City Railway Company, created by the first section of the act of 1859, and the Chicago West Division Railway Company, created by the first section of the

act of 1861, were expressly extended for ninety-nine years. While nothing was specifically said of the North Chicago City Railway Company in this connection, the tenth section of the act, after this amendment, we think, should be read in connection with the amended act, so that the act of 1859 is to be read as if it had originally been in the amended form. In this view the extended life of the corporations created by the first section must be read into the charter of the North Chicago City Railway Company, created by the tenth section.

We believe this view is sustained by reason and authority. *Holbrook* v. *Nichol,* 36 Illinois, 161. The rule was thus stated in *Farrell* v. *State,* 54 N. J. Law, 421: "As a rule of construction, a statute amended is to be understood in the same sense exactly as if it had read from the beginning as it does amended. *People* v. *Circuit Judge,* 37 Michigan, 287. In *Conrad* v. *Nall,* 24 Michigan, 275, a section in the chapter of the code was amended, and it was held that it was not intended to operate independently of the other provisions of the chapter, but that the whole chapter in its present form must be read as one act. The rule is correctly stated in Endlich on Statutes, section 294, as follows: 'A statute which is amended is thereafter, and as to all acts subsequently done, to be construed as if the amendment had always been there, and the amendment itself so thoroughly becomes a part of the original statute, that it must be construed, in view of the original statute, as it stands after the amendments are introduced and the matters superseded by the amendments eliminated.' " This view is strengthened by the language of the second section, which speaks of the deeds of transfer of rights between the corporations, in said several acts, or "any two of them."

The city of Chicago has constantly recognized the corporate existence of this company and has made numerous agreements with it as such corporation. In *Chicago* v. *Sheldon,* 9 Wall. 50, in considering a contract between the North Chicago City Railway Company and the city as to the extent of street improvement by way of paving, etc., which could be required of

the company under the ordinance of May 23, 1859, granting it rights and privileges in the streets, this court, speaking through Mr. Justice Nelson, concluded its opinion as follows: "A point is made that the legislature has not conferred, or intended to confer, authority upon the city to make this contract. We need only say that full power was not only conferred, but that the contract itself has since been ratified by this body." The learned justice, speaking of the contract, obviously referred to the ordinance of May 23, 1859, passed under the authority conferred by the act of February 14, 1859, and the ratification by the legislature under the act of February 6, 1865. We have no doubt that this act was intended to apply to the North Chicago City Railway Company as well as to the companies specifically covered in the first section of the act. The ordinance of 1858 in its tenth section gave the right to operate the "said railways for twenty-five years, and thereafter to parties operating said railways the enjoyment of all privileges granted until the common council shall elect by order for that purpose to purchase the tracks, railway cars, carriages, station houses, station grounds, furniture and implements of every kind and description used in the construction and operation of said railways or the appurtenances in and about the same." By section seven of the act of February 14, 1859, all of the rights and privileges granted or intended so to be to Parmalee and others, by the ordinances and amendments were confirmed and vested in the corporations. The affirmance of these rights and privileges gave them the sanction and made them part of the legislative act. Afterwards certain of the rights and privileges of the Chicago City Railway Company were transferred by the deed of July 30, 1863, as stated in said conveyance, to the Chicago West Division Railway Company. This deed of transfer is confirmed by the act of 1865. Later the system of railways was extended under ordinances of the city and with the assent of village boards of trustees. It is the contention of the receivers that by reason of the premises the railway companies became entitled to operate the entire system for

the extended period of the act of 1865—for ninety-nine years —and thereafter until the city of Chicago shall lawfully purchase all of the said railways, property, equipment and appurtenances, and pay for the same in cash at its then appraised value. It is the contention of the city that this extension of the right to purchase by virtue of the ordinance of 1858, affirmed in the act of 1859 and the amendment of 1865, must be confined to the streets covered by the ordinance of 1858. That the right to use the streets under the ordinance of 1858 was extended to all subsequently acquired rights to use the streets under the new contracts, so that the right would continue until purchase be made of the entire property of both systems of railway, we cannot concede. It does violence to the language of the ordinance of 1858, which, by its terms, is limited to the railways therein and thereby provided for, and would be an extension of corporate privileges by implication, in violence of the settled rule to which we have had occasion to refer in the principal discussion.

While not conceding the soundness of the contention that the right of purchase is extended to all the property of the railway companies by reason of the unity of the system, there are certain ordinances confirmed by the act of 1865 which require special attention. As we have seen, by the ordinance of May 23, 1859, permission was given to lay a street railway on and along certain streets and bridges in the south and west divisions of the city of Chicago, "and the same to keep, maintain and use and to operate thereon railway cars and carriages during all the term of the said act of February 14, 1859, specified and prescribed, in the manner and upon the conditions hereinafter designated." On the same day, May 23, 1859, a grant was made to the North Chicago City Railway Company of the right to use certain streets, the rights and privileges granted to be in force for the benefit of the company for the full term of twenty-five years from the passage of the ordinance and no longer. This difference in the grants to the two railway companies is significant. In the ordinance of 1858 the

grant to Parmalee and others was for the term of twenty-five years, with the right of the parties operating the railways to enjoy all the said privileges until the common council elect by order for that purpose to purchase the tracks and other property used in the construction and operation of said railways and appurtenances, and pay for the same in the manner designated in the ordinance. This grant was expressly confirmed by the act of 1859, in section seven thereof. Otherwise there was no specific grant in that act fixing the time for which the railway company might operate in the streets. As we have seen, in that law there was a distinct affirmation of what the common council had authorized the corporators to do, and might thereafter authorize the corporation to do by contract. The North Chicago City Railway Company, prior to the act of 1859, had no agreement as to streets. The reason for the grant of different terms to the different companies, we think, is apparent. On the west side reference was made to the term granted in the act of February 14, 1859, for the purpose of giving the Chicago City Railway Company the same term as had been granted and confirmed therein as to the streets named in the ordinance of August, 1858, and, in our judgment, gave to that company a grant in the same terms, that is, for twenty-five years, and until the city purchase in the manner designated. On the north side, there being no such legislative confirmation of rights already undertaken to be conferred by the council, the grant was specifically limited to a period of twenty-five years, "and no longer."

In considering the effect of the ordinances passed by the common council of the city of Chicago in the period from February, 1859, to May 3, 1875, it may be well to briefly summarize the terms of these ordinances. They will be found in the margin.[1]

---

[1] On the west side we find the following:

May 23, 1859—

　"A grant during all the term in the said act of February 14, 1859, specified and prescribed." Streets are designated and the time

After the passage of the Cities and Villages Act of 1872, accepted by the city of Chicago in May, 1875, the following ordinance was passed, being the so-called "compromise ordinance:"

for completion of the railways thereon is limited, for some at three months, others at five, one year and eighteen months, and still others "as soon as practicable."

February 13, 1860—

Amendatory of the above last-mentioned ordinance. Extends the time for completion to ten years for some, and five years for others. Certain lines mentioned must be completed in two years.

November 18, 1861—

Exempting certain streets and substituting others. Ordinance of May 23, 1859, in force except as amended, and time for completion of certain railways named is extended to five years

November 16, 1863—

Excluding railways from certain streets named.

March 14, 1864—

Releasing one street and substituting another.

March 28, 1864—

Authority to remove from one street to another.

March 28, 1864—

Authorizing temporary tracks while a bridge is being constructed.

July 11, 1864—

Amending ordinances of March 28, 1864, repealing the temporary use of certain streets.

August 17, 1864—

Creating new lines, extending others, and regulating the use thereof. Times for completion fixed at ninety days and fifteen months. No time or duration stated by reference or directly.

November 13, 1871—

Extension of tracks on certain streets named.

March 8, 1875—

Authorizing the construction and operation of a new line. To be completed by October 1, 1876, and the term to extend to October 1, 1894, and thereafter until purchased by the city.

April 19, 1875—

Amending last-mentioned ordinance as to certain uses and legal claims arising from the operation of the lines.

On the north side we find the following:

May 23, 1859—

Term "twenty-five years and no longer." Times for completion fixed at January, 1860, and July, 1862, different for some than others.

January 18, 1864—

Term "subject to all the rules and limitations and restrictions"

July 10, 1883 (amended August 6, 1883)—
    Extending the term for twenty years from this date.
    ·  Accepted by North Chicago City Railway Company,
    August 8, 1883; by the Chicago City Railway Company
    and the Chicago West Division Railway Company,
    August 10, 1883.

This ordinance contained this proviso, "but nothing in this section contained, or the acceptance hereof, shall in any manner impair, change or alter the existing rights, duties, and obligations of the city or of said companies, respectively, from and after the said term of years hereinbefore mentioned."

We thus perceive a consistent purpose running, through the grants to the north side company to adhere to the term of the original ordinance of May 23, 1859, limiting the right to use the streets to the period of twenty-five years, "and no longer," by reference in subsequent ordinances, to the prior ordinance. We do not regard the exceptional character of the ordinance of October 26, 1874, amended April 26, 1875, as overcoming, as to other ordinances, the general purpose reflected in them. That ordinance was a grant in part to the

---

· prescribed in the ordinance of May 23, 1859. Authorizes connection of tracks.

August 11, 1864—
    Term "subject to all the restrictions and conditions, the rights and privileges, mentioned" in ordinance of May 23, 1859. Time for completion fixed at sixty days, unless restricted, etc.

May 8, 1871—
    Same term. Time for completion fixed at June 1, 1872, for the street railway named.

November 20, 1871—
    Term "subject to all rules and limitations and restrictions" prescribed in ordinance of May 23, 1859. Rights and privileges granted shall continue for a term of —— years.

October 26, 1874—
    Term until October 1, 1894, and thereafter until purchased by the city. To be completed July 1, 1875. As lessee of Chicago City Railway Company as to certain portion.

April 26, 1875—
    Amending the last-mentioned ordinance, and otherwise similar to it as to terms and conditions.

North Chicago Company as the lessee of the Chicago City Company, and was doubtless changed in terms to make it comply with the grant of the latter company as to streets in which it operated.

As to the west side companies we find running through the ordinances making grants in the divisions covered by that system a purpose to preserve the original permission of the ordinance of August 16, 1858, which granted the use of the streets for the term of twenty-five years and until purchase by the city. The language used in the ordinance of May 23, 1859, granting the use of the streets, is "during all the term in said act of the fourteenth of February, A. D. 1859, specified and prescribed." This ordinance and similar ones passed prior to the act of February 6, 1865, were confirmed by that act, and rights under them were reserved by the compromise ordinance of July 10, 1883. We hold that when streets were occupied under the authority of these ordinances the company has the right to the use of the streets until the city shall purchase under the contracts thus made.

In the west side system, the ordinance of August 17, 1864, is silent as to the term of the grant. We do not think this indicates any intention on the part of the city, even if it had the power under legislative acts then in existence, to confer the right in perpetuity to the occupancy of the streets, a point which we do not feel called upon to decide. The other ordinances by direct terms or references to prior ordinances have made the grants for the west side system for the term of twenty-five years, and until purchase by the city, in the manner stated, and we do not think there was any intention to depart from the plan in this one ordinance omitting specifically to name a definite time of occupancy. At this time there had been no extension of the life of the corporation, and it was specifically limited to twenty-five years.

In reaching this conclusion we are not unmindful of the decision of this court in *Detroit* v. *Detroit Citizens' Railway Company*, 184 U. S. 368, 395, holding that although a corpo-

ration be organized for a limited period by the terms of its charter, it may receive a grant which would inure to the benefit of those lawfully entitled to succeed to the rights of the corporation, although for a period of years beyond the corporate life. But in the present case the right granted must be construed with reference to the system of which it was made a part, and where the terms of the grant were limited to twenty-five years, and until purchase, we can find no intention to grant or receive a perpetuity simply because no term of years was named in the one ordinance under consideration.

It is contended that whatever rights would otherwise be included in contracts confirmed by the act of 1865, they were lost to the companies by accepting the privileges conferred in the "power ordinances" of June 7, 1886, and March 30, 1888. But prior to the passage of those ordinances was the so-called "compromise ordinance" of July 10, 1883, as amended August 6, 1883, settling certain controversies as to license fees and street paving, and extending the time of operation for twenty years, and further providing: "But nothing in this section contained, or the acceptance hereof, shall in any manner impair, change or alter the existing rights, duties and obligations of the city, or of said companies, respectively, from and after the expiration of the said term of years hereinbefore mentioned." In the North Chicago City Railway ordinance and the West Chicago City Railway Company ordinance clauses are inserted to the effect that privileges as to time after the expiration of the term of twenty years are to be governed by ordinances theretofore passed. In view of this reservation we are of opinion that whatever rights and privileges the company had in the streets after the expiration of the time limitation in the "power ordinances" were not lost by the acceptance of privileges conferred in those ordinances.

It is contended that the railway companies had no power to accept ordinances for the use of other than animal power in the operation of railways, because of the titles of the various

acts which constituted the charter of the companies, limiting them to the use of animal power, and because of the constitutional provision, which we have referred to earlier in this opinion, providing that no private or local law shall embrace more than one subject, which shall be expressed in its title. We think the intention of the legislature in this respect was not to confine the operation of the road to animal power, but to incorporate street railway companies as distinguished from steam railways, and to endow them with the rights and privileges named in the acts. Section two of the law (act of 1865) expressly gives the power of amendment, in providing that "it shall be competent for the said common council, with the written consent or concurrence of the other party or parties or their assigns to any of said contracts, stipulations, licenses or undertakings, to amend, modify or annul the same." We think this grant of power was broad enough to authorize the city to grant, and the railway company to accept, a changed method of operation of the railways by applying thereto a new and more efficient and economical power. It is true that the Supreme Court of Illinois in *North Chicago City Railway Company* v. *Town of Lake View*, 105 Illinois, 207, held that the charter of the North Chicago City Railway Company had not authorized a steam railway, but that court has held in later decisions that an electric railway, incorporated under the general incorporation acts to build horse and dummy railways, might organize a street railway company to be operated by electricity or by any motive power other than steam, and might appropriate private property for this purpose. *Harvey* v. *Aurora & Geneva Railway Company*, 174 Illinois, 295, 299. The court has also held that the provisions of the horse and dummy act applied to electric railway companies, as did a paragraph of the general incorporation act in regard to horse railways. We think the Illinois cases recognize the distinction in legislation in that State between railways intended to be operated upon the streets of the city of Chicago and other cities for local accommodation, and steam railways as such are

generally understood.. And the declaration inserted in the title of the acts, that they concern horse railways,' will not, because of the constitutional provision,' prevent the exercise of the power of amendment conferred by law upon the city and the companies in such manner as to authorize the use of such power as electricity and cable.   We agree with the learned Circuit Court that these grants as to changed methods of operation were within the powers legally conferred by the act of 1865.   Furthermore, on June 9, 1897, the legislature passed an act having application to companies organized under general or special laws, which provided: "Every such street railway may be operated by animal, cable, electric or any other motive power that may have been or shall hereafter be granted to it by the proper public officers or authorities, except steam locomotive engines."   It is true that this statute was repealed by the act of March 7, 1899, but we do not perceive how this could destroy its effect to ratify the contracts which were in existence when the act was passed.   This view renders it unnecessary to pass upon the question whether the city of Chicago, having undertaken to authorize the use of new power, upon the faith of which authority large sums of money have been expended and extensive changes made, can now be heard to say that it had no authority to grant such right.

The learned Circuit Court held that privileges granted under ordinances of the town of Jefferson were limited to twenty years.   This ruling, it is contended by the Chicago West Division Railway Company, is erroneous, because of the act of 1859, which provided: "Section 5. The said corporation is hereby authorized to extend the said several railways herein authorized to be built in the manner aforesaid to any point or points within the county of Cook, in this State; and to enable said corporation to construct any or all of the railways therein authorized, or their appendages, the said corporation is hereby vested with power to take and apply private property for the purposes and in the manner prescribed," etc.   Section 6: "The said corporation is hereby authorized,

with the assent of the supervisor of any township, to lay down and maintain its said railway or railways in, upon, over and along any common highway in said township, but in such manner as not to obstruct the common travel of the public over the same." The town of Jefferson was one of the townships in Cook County, adjoining the city of Chicago on the northwest. So far as the record discloses, no effort was made to extend the lines of the Chicago West Division Railway Company into the town of Jefferson until 1877. Before that year the town of Jefferson had adopted the provisions of the Cities and Villages Act of 1872, in which the power to grant the use of the streets for street railway purposes was limited to twenty years. On January 28, 1878, the village passed the ordinance granting to the Chicago West Division Railway Company and its successors the right to maintain and operate a street railway in Milwaukee avenue and Armitage road, in said village, the rights and privileges thereby granted to extend for the term of eighty-one years. Under the act of 1859 the right to lay down tracks and maintain railways over and along the common highways in the townships in Cook County required the consent of the supervisor in the township. This does not appear to have been obtained, and when the authority was given by the president and board of trustees of the village, it was subject to the limitation already referred to. We cannot assent to the soundness of the argument that the act of 1859, in the event of the abolition of the office of supervisor, during the life of the corporation, would authorize the extension to these adjoining townships of the system of railways intended to be constructed, without official consent.

Before the passage of the act of 1865, incorporating the board of trustees of the town of Lake View, the supervisors granted permits to use some of the highways of Lake township. This authority was exercised under sections five and six of the act of February 14, 1859. We cannot agree that the duration of these permits would be in perpetuity, because of the fact that no time was specifically named in them. The extension into

Lake View was part of the north side railway system, which by the terms of the grants from the city were limited to twenty-five years, and no longer. There certainly could be no intention in granting these permits from the supervisors as extensions of the system to make perpetual grants, when the right of user of the main part of the line was expressly limited to twenty-five years. A fair inference would be that, in extending this part of the system so as to make a portion of that already granted, such grants were to be for the same term as those already made. As to extensions in the town of Lake View, obtained otherwise than from the supervisors, it appears that on February 16, 1865, an act was passed entitled "An act to incorporate a board of trustees for the town of Lake View, in Cook County," and it was provided that the supervisors, assessors and commissioners of highways and their successors in office should be constituted and incorporated, *ex officio*, a board of trustees for the said town of Lake View. On March 5, 1867, an amendatory act was passed entitled "An act to incorporate a board of trustees for the town of Lake View, in Cook County," which provided (section 7) that the board of trustees should have the control and supervision of the highways, streets, alleys and public parks in said town. This board afterwards passed ordinances consenting to the laying down of tracks in the town of Lake View, on a number of avenues and streets named in the ordinances.

The cases in the state courts are much divided as to the right of a municipal corporation, because of its charter power of controlling the streets, to grant the use thereof to a street railway company. Some of the cases are collected in *Detroit Citizens' Railway Company* v. *Detroit*, 64 Fed. Rep. 628, 637.

The act of 1859, section six, required the consent of the supervisor to the extension of the railways into townships of Cook County outside of Chicago. When the supervisor became a member of the township board of trustees and that board gave its consent, we think this satisfied the requirement of the act in that respect. The legislature might have given the railway

company the right to extend its lines in Cook County without the consent of any local authority. We are not concerned with the general powers of the supervisor. When the legislature designated him as the official whose assent should be obtained it empowered him to give such assent, and when given in any substantial way that satisfied the requirements of the act of 1859.

As we understand the decisions of the Supreme Court of Illinois, the power to control the streets and highways by the township trustees, given by the act of March 5, 1867, would include the right to authorize their use for street railway purposes. In *Chicago Municipal Gas Light Co.* v. *The Town of Lake*, 130 Illinois, 42, 54, the court held: "The power to control and regulate the streets, alleys and other public places within the limits of the town of Lake, and abate any obstructions, encroachments or nuisances thereon, was given, in its charter, to the corporate authorities of the town. Under this power the town could lawfully permit any use of such streets and alleys that is consistent with the public objects for which they are held, and could make a grant of a right of way for the purpose of laying gas pipes and mains under the surface." In *People* v. *Blocki*, 203 Illinois, 363, 368, the same court said, having reference to a grant of the right to lay switch tracks in the street: "The street, at the time said permits were granted, was under the control of the board of trustees of the town of Lake, and under the power conferred upon that municipality by law it was authorized to allow the use of said street for any purpose not incompatible with the purpose for which it was established, and to allow a railroad track to be laid therein was not a use incompatible with the purpose for which it was established." In *City of Quincy* v. *Bull*, 106 Illinois, 337, on page 349 it was said: "In this State there is vested in municipal corporations a fee simple title to the streets. Under the power of exclusive control over streets, it is very well settled by decisions of this court that the municipal authorities may do anything with, or allow any use of, streets which is not in-

compatible with the ends for which streets are established, and that it is a legitimate use of a street to allow a railroad track to be laid down in it. *Moses v. Pittsburg, Ft. Wayne & Chicago Railroad Co.*, 21 Illinois, 515; *Murphy v. City of Chicago*, 29 Illinois, 279; *Chicago & Northwestern Railway Co. v. People ex rel.*, 91 Illinois, 251." In view of these Illinois decisions, construing the legislative acts of the State, we think the learned Circuit Court erred in holding that the trustees of the town of Lake had no power to grant the railway the use of the streets for street railway purposes.

The question remains as to the term for which the rights granted by the trustees and the municipality of Lake View were to be held.. The ordinances making these grants required the company to perform certain duties to the municipalities, such as the laying of pavement subject to the approval of the trustees. On April 16, 1887, the incorporated town of Lake View became incorporated as the city of Lake View under the Cities and Villages Act of 1872. On July 15, 1889, the territory included in the city of Lake View was annexed to the city of Chicago. We think in such case that the terms granted would not extend beyond the life of the corporation conferring them where there was no attempt to confer a definite term, assuming, without deciding, that it was within the authority of the municipality to grant a perpetuity. Our attention has been called to a late case decided in the Supreme Court of Illinois, *People ex rel. v. Chicago Telephone Co.*, not officially reported, in which it was held that where trustees of villages and towns have granted rights extending telephone privileges not for a definite period, that such grants could not be construed to be perpetuities and did not extend beyond the lives of the corporations granting them. The court says: "The ground of the defendant's claim that the ordinance does not limit its charges in the annexed territory is that before the annexation the minor municipalities had granted to it the right to occupy the streets therein for its business, without any limits as to time. If the grants had been for terms of

years under legislative authority authorizing them, and the term had extended beyond the existence of the corporations granting the privileges, there might be ground for saying that the grants were binding upon the city, because they had become binding contracts under which the defendants had vested contract rights for such term; but they were not for definite periods, and the grants were in consideration of furnishing something to the town or village, such as telephone service to the town or village hall or the village authorities, free or for some reduced rate. Such grants cannot be construed to be perpetual, and at most, cannot extend beyond the lives of the corporations granting them. Upon annexation there ceased to be any town or village authorities entitled to the benefits of the contract or authorized to demand or receive them, and it could not have been understood that the grant could continue, discharged of the obligation annexed to it. . . . The ordinances of the city extended over the annexed territory immediately upon annexation, *Illinois Central R. R. Co.* v. *City of Chicago,* 176 U. S. 646, and the limitations of the ordinance applied to the annexed territory."

This seems to us a reasonable view, and being the construction of the highest court of the State of Illinois, we are willing to accept it. Furthermore, these grants in Lake View were mere extensions of the old system, which, as we have seen, was limited in its rights to use the streets received from the city to the term of twenty-five years, extended twenty years by the compromise ordinance. In the absence of express language conferring a longer term, we do not think it was intended to extend the grant beyond the period already permitted to the system by grants from the city.

As we have said, we do not deem it necessary to take up all the questions which were raised and determined by the Circuit Court in considering the case and settling the decree in that court. Upon further proceedings the judgment of this court is only to be held conclusive upon matters specifically stated in this opinion.

*The decree is reversed and the cause remanded to the Circuit Court for further proceedings, in accordance with the views herein expressed.*

MR. JUSTICE McKENNA, with whom concur MR. JUSTICE BREWER and MR. JUSTICE BROWN, dissenting.

This case as to questions common to all the railways depends mainly upon the acts of 1859 and 1865—incidentally upon the act of 1861. The latter act may be omitted from special consideration, as it depends upon the others. Private Laws of Illinois, 1861, p. 340. It incorporated the Chicago West Division Railway Company and gave to that company all the powers conferred upon the other companies by the second, third, fourth and sixth sections of the act of 1859.

It will be observed of the acts of 1859 and 1865 that they created corporations respectively for the period of twenty-five and ninety-nine years, and empowered them to construct, maintain and operate a single and double track railway in Chicago.

The acts, as was remarked by the Circuit Court, fall into three divisions: (1) The granting part, the authority of the companies to construct railways; (2) the identifying part, the designation of the streets by the common council; (3) the terms and conditions of the occupation of the streets by the companies and the manner in which the terms and conditions shall be prescribed.

The meaning of the third division is one of the chief controversies in the case; in other words, the extent of the authority of the common council—whether it was virtually an authority to grant rights in the streets or authority to regulate the rights conferred by the legislature; or, as it is aptly expressed by the Circuit Court, whether it was an authority to fix by stipulation with the companies that which relates "to the physical side of the occupancy of the streets or the administrative side of the operation of the lines."

It will be convenient in the discussion to exhibit the acts of 1859 and 1865, showing wherein the latter amends the former, omitting the provision extending the corporate lives of the companies from twenty-five years to ninety-nine years, about which there is no dispute. The words in italics are the amendments made by the act of 1865:

"The said corporation is hereby authorized and empowered to construct, maintain and operate a single or double track railway, with all necessary and convenient tracks for turn-outs, side tracks and appendages, in the city of Chicago and in, on, over and along such street or streets, highway or highways, bridge or bridges, river or rivers, within the present or future limits of the South *and* [or] West Divisions of the city of Chicago, as the common council of said city have authorized said corporators or any of them or shall *from time to time* authorize said corporations, *or either of them,* so to do, in such manner and upon such terms and conditions *and* with such rights and privileges, *immunities and exemptions* as the said common council has or may by contract with said parties, or any or either of them, prescribe; *and any and all acts or deeds of transfer of rights, privileges or franchises between the corporations in said several acts named, or any two of them, and all contracts, stipulations, licenses and undertakings made, entered into or given, and as made or amended by and between the said common council, and any one or more of the said corporations, respecting the location, use or exclusion of railways in or upon the streets, or any of them, of said city, shall be deemed and held and continued in force during the life hereof, as valid and effectual, to all intents and purposes, as if made a part, and the same are hereby made a part, of said several acts: Provided that it shall be competent for the said common council, with the written consent or concurrence of the other party or parties, or their assigns, to any of said contracts, stipulations, licenses or undertakings, to amend, modify or annul the same.*"

It is obvious, as far as words can accomplish it, and as directly as words *can* accomplish it, the companies were granted

the right "to construct, maintain and operate" railways upon the streets of the city. And no other power could have granted such right. *Chicago City Ry. Co. v. The People ex rel.*, 73 Illinois, 541.

That such grant must come from the State is, of course, not denied, but it is urged, that the grant of rights passed to the railway companies through the agency of the city, the city receiving a delegation of the State's power. This is based upon the words of the city's charter, and the authority given in the acts of 1859 and 1865 to designate the "terms and conditions" upon which the streets might be occupied.

The view I take of the acts makes it comparatively unimportant to consider the city's charter. There seemed to be a necessity for the acts, and they were complete in themselves, independent of other grants of power, except what were continued or confirmed by them. If the charter was adequate to invest in the city plenary power over the streets, we may wonder at the enactment of those statutes and many years of misapprehension of them and concern about them. Counsel for the companies assert, and the assertion does not seem to be denied, that an injunction was issued by the Circuit Court of Cook County, restraining the laying of tracks under the ordinance of 1858. The extent of the power of the city, however, I shall presently consider more at length, and will now pass to those parts of the act which the city insists conferred authority on the common council.

The stress of the argument is on the words "terms and conditions," in the third division. The city contends, and the court decides, reversing the decree of the Circuit Court, that the authority of the city to prescribe terms and conditions of the occupation of the streets included the authority to fix the time of occupation. I dissent from that interpretation for several reasons. It is opposed to the context in which the words "terms and conditions" are used. It is opposed to their primary and natural meaning. It would be a careless employment of them, and disregard or destroy dis-

tinctions necessary to be observed.   As was said by the Circuit Court, ordinarily in legal phraseology those terms are not employed "to convey power over the time or period through which the tenure dealt with is intended to run; but conveys power over, or relates to the means, the methods, and the incidents connected with the exercise of such tenure." Citing *Hurd* v. *Whitsett*, 4 Colorado, 77; *Chicago Terminal R. R. Co.* v. *Chicago*, 203 Illinois, 576.   Of course, directness and simplicity of methods are not always used, but some argument can be based on their omission, and it is natural to believe that had it been intended to give the power contended for to the city, words would not have been employed which would have to be turned from their first and legal signification to express it, and which could be claimed to be in opposition to other parts of the act, and made dependent, besides, upon contracts with the companies, which could only be amended by consent of the companies.   The power would have been more directly conferred by a delegation of the whole matter to the city, and would have been absolute—not limited or embarrassed or opposed by conditions unnecessary to it.

The act of 1859 was certainly a direct grant from the State to the companies for the time of their charter life, and the necessity or the advisability of conferring authority upon the city to limit the time of occupancy of the streets could not have entered into the head of anybody.   No conditions existed which suggested the necessity or prudence of giving such authority.   The time of occupancy expressed in the ordinance of 1858, the time of the life of corporations prescribed in the act of 1859, and the time for which the franchises conferred by that act could be exercised, all coincided.   It could not have occurred to any one that twenty-five years, the term fixed in all the instruments, was injuriously long and demanded authority somewhere to limit its excess.   To these considerations as proof that the words "terms and conditions" were not intended to give authority to prescribe a time

of occupancy of the streets may be added that of contemporary practice.

By an ordinance passed in 1859 the time of occupation was expressed to be "during all the term in the said act of the fourteenth of February, A. D. 1859, specified and prescribed." This, as said by counsel for the companies, "is a distinct recognition of the fact that the term for the enjoyment of the franchise was to be found in the statute, and was not among the elements of the contract which the ordinance might prescribe."

With the act of 1865 there came a change—differences from the act of 1859 of conspicuous and striking import. These differences were too full of meaning not to be considered enlargements of the act of 1859, and they were not misunderstood. The lives of the corporations were extended to ninety-nine years. There is no dispute about this, and it would seem necessarily that the other provisions were on account of and completed the purpose of the extension. And the extension had some valuable purpose. It was certainly not for the purpose only of extending the time of the abstract beings with nothing to do—no functions to exercise, no rights, no obligations—and the latter might, we can conceive, be as necessary for the public to enforce as the former for the companies to exercise. *Union Traction Co.* v. *City of Chicago,* 199 Illinois, 484. It would be a strange confusion and confounding of purposes to make the existence of a corporation more important than that which it was created to do. Necessarily, life and functions went together, the term of the rights and obligations of the corporations coinciding with the term of their life.

This coincidence of the life and the rights of the corporations being kept in mind, we can easily resolve whatever ambiguities are in the statute of 1865. It will give to every word a use and meaning, and keep distinct the power which was exercised by the legislature and the powers to be exercised by the common council. Let me, at the expense of repetition, enter into some detail. The act of 1865, amending the act of

1859, enlarged the life of the corporations from twenty-five years to ninety-nine years, and in section 2 empowered the companies to "construct, maintain and operate" a single or double track of railway in the streets of Chicago. These words necessarily imported a continuing power. Time was of the very essence of the right. It is true that there was no designation of time but the life of the corporations, but this was sufficient in the absence of qualification, and there was no qualification, certainly none in explicit words. Streets were not designated by name, but in a certain sense all streets were subject to whatever right was given, though it could be exercised in none without the designation of the common council. This is sought to be made very dominant—determinative, indeed, of the power of the city—making the city, in effect, the source of the rights of the companies, not merely the regulator of the manner of exercising those rights.

Upon what reasoning is the conclusion based? Before considering the question, however, let me refer to the statement in the opinion that "the council made and the companies accepted specific ordinances fixing the time of occupancy, as had been done in the original ordinances of May 23, 1859. And neither before nor after the passage of the act of 1865 was the ninety-nine year term recognized or acted upon in ordinances granting the use of streets." I am uncertain as to the conclusion deduced from the statement. It needs some explanation. Standing alone it may produce an erroneous impression. If the companies accepted the ordinances, conceding the power of the city, without protest or reservation of their rights under the act of 1865 to longer terms of occupancy, there could be no controversy over the interpretation of the act of 1865. Other considerations would supervene and demand attention. Counsel for the city contended for an estoppel against the companies, and because the court has not responded to that contention, but discusses and bases its opinion upon the meaning of the act, I also have discussed its meaning as necessary to the case and determinative of it;

and I recur to the question, Upon what reasoning is the plenary power of the city supported?

First, let me quote the language of the act of 1865, separated from the parts which I think are not relevant to the present part of the discussion: "The said corporation is authorized and empowered to construct, maintain and operate a single or double track railway . . . in the city of Chicago, and in, on, over and along such street or streets . . . as the common council of said city have authorized said corporators, or any of them, or shall from time to time authorize said corporations, or either of them, so to do, in such manner and upon such terms and conditions . . . as the said common council has (prescribed) [1] or may by contract with said parties, or any or either of them, prescribe, . . . and any and all acts or deeds of transfer of rights, privileges, or franchises between the corporations in said several acts named, or any two of them, and all contracts, stipulations, licenses, undertakings made, entered into or given and as made or amended by and between the said common council, and any one or more of the said corporations, respecting the location, use or exclusion of railways in or upon the streets, or any of them of said city, *shall be deemed and held and continued in force during the life hereof, as valid and effectual to all intents and purposes as if made a part of said several acts.* . . ." (Italics mine.)

The language is orderly and, to me, unmistakable in its relations and meaning. What element is omitted necessary to the clear expression of a definite purpose? Not one. We have already seen that the rights given would have been, if there had been no other expression of time, coincident with the life of the corporations, but time was not left to implication, however clear the implication might have been. It was expressed. It is true it is not said that the rights, contracts, etc., shall be "held and continued in force" for ninety-nine years. If it

---

[1] In *Union Traction Co.* v. *City of Chicago*, 199 Illinois, 484, 524, it is said "the word 'prescribed,' to which the word 'has' applies, was accidentally omitted."

had, there certainly would be no ambiguity. It would suit with the other words and complete their meaning without change of a single syllable. Why then is there any ambiguity, if we substitute an equivalent for the phrase "for ninety-nine years"? If, "during the life hereof," is not the equivalent for ninety-nine years," that is, the life of the corporations, what does it mean?

There are various answers offered, some accepting that meaning, others disputing it. One counsel for the city submits rather tentatively that the words "during the life hereof" may be words of limitation, and that "the grants by the common council thus ratified by the act should continue for their full term," unless "the corporate existence of one or more of the corporations be terminated by dissolution or forfeiture within the period for which its privileges in the streets were granted." It is said "thus construed, the act means precisely and exactly what it says, that is, during the life, *i. e.,* during the corporate lives of the several companies, the contracts made with them by the common council are as valid and effectual as if made part of the act.  . . ."

Other counsel for the city leave a choice of interpretations. They say "the expression during the life hereof" is vague and ambiguous. It may be capable of three interpretations: As meaning the life of the act; or the life of the deeds, licenses and contracts; or the lives of the railway corporations, respectively. They incline rather to the second, and say that "during the life hereof" means the life of the section or the matters mentioned in the section, and "hereof" should be changed to "thereof." The court accepts neither of the interpretations, but gives its authority to another. It was apparent that the interpretations advanced by counsel were too restricted and ignored too much the words of the act. It was apparent that the clause referred to the lives of the corporations (ninety-nine years), continued something for those lives, and the court selects as the things so continued "the acts or deeds of transfer between the corporation so far as

they relate to franchises which are not subject to the express limitations of the act—that they shall stand as made." The construction, however, is not confidently asserted. It seems to be adopted in submission to the rule of strict construction. A word therefore as to that rule.

I concede the rule to be that nothing passes by a grant of franchises, such as those conferred by the acts under review, unless it be clearly stated or necessarily implied, but I do not think the statutes under review call for an application of the rule. Whatever is ambiguous in the acts yields a definite and consistent purpose and meaning by the application of the simple rules of interpretation. In such case there is no place for the rule of strict construction. Our reports abound in cases where, against bold and able controversy, public grants have been sustained, and where division in the court has marked with emphasis the strength of the doubts which existed. And we have taken care to warn against a misunderstanding of the rule in a case of significant import. It will be conceded, I think, that the power of taxation is the highest attribute of sovereignty, one the most necessary to it, and against the limitation. of which all intendments proclaim. *The Delaware Railroad Tax,* 18 Wall. 206. Limitations of this power have been sustained in favor of private individuals arising from statutes of disputable meaning. In *Citizens' Bank* v. *Parker,* 192 U. S. 73, interpreting the charter of the bank, it was held that the bank was exempt from a license tax, and we there said that the rule of strict construction is to be used to solve ambiguities, not to create them. There was a dissent that pressed the rule against the reasoning and conclusions of the court.

Returning then to the argument of the court, not required by any rule to find ambiguity in the statutes, but required by every rule to solve if found, what is that argument? Its first premise is the assumption that it was the policy of the State to vest in the city the control of the streets. Some control, yes; but how much? Was it a policy of unlimited or qualified

control; the grant of rights in them or the regulation of rights? Or, to use a technical term, the grant of franchises or the grant of power of administration over their exercise? The answer is found in the case of *Chicago City R. Co.* v. *The People ex rel., supra.*

The case was based on the act of 1859, and the right derived from it as distinguished from rights derived from an ordinance of the city. It was said: "It is a misconception of the law to suppose the railway company derives its powers to construct a railroad from any ordinance of the city. All its authority is from the State, and is conferred by its charter. The city has delegated to it the power to say in what manner and upon what conditions the company may exercise the franchises conferred by the State, but nothing more." The reason given was that the ordinance emanated from a source not "competent to grant a franchise." That power the legislature alone possessed. The date of the ordinance was November 13, 1871. It is manifest, therefore, that the policy of the State of Illinois up to 1871, and necessarily in 1859 and 1865, was not to give its municipal corporations the authority to grant a right in the streets, but only empowered them to regulate the right. And it was necessary to decide the kind and the extent of authority that was vested in the city. It was urged that the ordinance passed on purported to grant "special privileges" or "franchises," and was therefore void under the constitution of 1870. The court replied that the ordinance did not grant a franchise and that by no construction could the constitution be said to be a "limitation upon the municipal corporation to designate certain streets and fix the conditions upon which a railway company, organized under a special charter previously granted or under a general law since the adoption of the constitution, might lay its track." (p. 548).

This view acquired emphasis from the dissenting opinion, which took issue with the court and virtually made the city the source of the rights of the railway and not the State, and,

describing what. the court said. as to the power of the city, observed: "These special privileges of the rights of the railways upon particular streets are said to be conferred, not by the city by its ordinance, but by the State by the company's charter, and the *city only regulates the use.*" (Italics mine.)

The case was decided in 1874, and the principle it declared is the exact contention of the railways to-day, and,: to the strength of the reasoning of the court, may be added the consideration that the property acquired and the investments made under the sanction of the decision for thirty-two years now claim its protection against impairment. Such considerations should prevail over ambiguity, could ambiguity ever have been asserted to exist. It received its solution and should never again be brought forward to cloud the meaning of the statute.

The distinction between the plenary and the limited control over the streets by the city is substantial in the controversy between it and the railway companies. Manifestly, the power to grant a franchise is not the same as the power to designate streets on which the franchise can be exercised. Of course, the streets must be designated before the franchise can be exercised, and therefore the power to designate may be magnified and confounded with the other power. It is so magnified, and the inability of the railroads to compel any action upon the part of the city is urged and dwelt on by counsel. The argument is that, as the city could have refused to designate any street, it had the right to exact anything of the railroads. In other words, the defects in the remedies of the railway companies enlarged the power of the city and changed the nature of the grant to the companies. Or it may be put this way, the power given to the city as a subordinate instrumentality of the State may be employed to defeat the purpose of the State. This cannot be done. *Appeal of City of Pittsburg,* 115 Pa. St. 4; *Atlantic City Water Works Co.* v. *Consumers' Water Company,* 44 N. J. Eq. 427; *Galveston, &c., R. Co.* v. *Galveston,* 90 Texas, 398; *S. C.,* 91 Texas, 17; *Homestead*

*Street Railway* v. *Homestead Electric Railway,* 166 Pa. St. 162, 171, 172. And I may observe that there are some duties, the performance of which cannot be immediately coerced. It need not be pointed out that the agencies of government are kept, in a great measure, to coöperation by sense of duty and propriety, and if they should, disregarding that sense, exercise the mere physical power possessed, to refuse to act, disorder, temporary at least, would result. It is besides a strange contention to me that a municipality of a State, because of its ability, physical, it may be, more than legal, to refuse to exercise powers conferred upon it, can assume or assert other powers. Let us not overlook that a municipality must have warrant, express or necessarily implied, for what it does. It, too, is within the rule of strict construction. Dillon on Municipal Corporations, section 91.

In the grant of franchises from the State and their regulation merely by the city there was no inconsistency, and this division of functions was not only natural of itself, but comported with the policy of the State, as explained in *Chicago City Ry. Co.* v. *The People, supra.* The decision cannot, it seems to me, be explained away. It was nearer in time to the enactment of the statutes than we are to-day, and it is the conditions of that time we should try to realize. This is not as easy as it seems to be. Whatever we may profess, it is not easy to realize the conditions, thoughts and purposes of another time. In 1859 nothing indicated the necessity of giving the city the power now contended for. In 1859 there could be no foresight of the development of street railways. Then they were just beginning to be thought of as a means of transportation and the city was as eager to procure them as capitalists to construct them. It is said that time is the wisest thing on earth, and taking to ourselves its wisdom, in 1906, we are sure we would have seen in an enterprise just starting, and yet tentative, the growth it might attain and the measures that would be necessary to restrain and control it. But if there was anyone capable of such prophecy the act of 1859 did

not challenge its exercise. There was nothing in it excessive, as I have already pointed out; nothing to invoke a jealous care. I dwell on this because the provisions of the act of 1859 were carried into the act of 1865, and certainly were not intended to give a greater power to the city than when used in the act of 1859. In other words, a provision which could have had no purpose in the act of 1859 to give power to the city to fix the time of the occupation of the streets could not, by mere repetition, in the act of 1865 have such purpose.

The situation in 1859 was exceedingly simple. Certain persons had been given the power by an ordinance of the city to construct a street railway. The right under the ordinance was questioned—maybe it had been adjudged illegal, and the act of 1859 was passed. It explicitly gave, in my opinion, the right to construct and operate railways in the streets and gave authority to the city only to regulate the exercise of the right. But granting that some of its words are ambiguous— granting that the words "terms and conditions" can be interpreted to authorize a limitation of time—such interpretation is not the only one of which they are susceptible. We should, therefore, consider whether that interpretation can be adhered to in view of the other provisions of the act of 1865.

First, I may lay down as a fundamental rule that we must seek the meaning of the act from its words, and that we should so exercise interpretation as "to bring a sense out of the words used, and not to bring a sense into them." *McCluskey* v. *Cromwell*, 11 N. Y. 593, 602. And with the consequences of the act we should not concern ourselves. This court has said that a plain meaning of a provision of a statute not contradicted by another provision must prevail, even against a charge of absurdity and injustice, unless they be so monstrous that all mankind would without hesitation unite in rejecting the meaning. *Sturgis* v. *Crowninshield*, 4 Wheat. 122, 202. With these rules in mind, and by referring to section 2 of the act of 1865, it will be observed that its parts are providently arranged and its words are clear—so clear, that conjecture must be put

to work and speculation must be indulged in to resist their manifest meaning.

The section makes provision for certain things, to wit, (1) the acts or deeds of transfer of rights, privileges or franchises between the corporations; (2) contracts, stipulations, licenses and undertakings made and entered into "and as made or amended" between the corporations and the common council "respecting the location, use or exclusion of the railways in or upon the streets." And what is done with these things? The answer is in the following provision: "shall be deemed and held and continued in force during the life hereof as valid and effectual, to all intents and purposes, as if made a part, and the same are hereby made a part, of said several acts." Can a distinction be made between the things provided for? Which of those things shall "be deemed and held and continued in force during the life" of the corporations? I say life of the corporations, as that, it is decided, is the meaning of the phrase.

Considering the language of the provision, there can be but one answer. It permits no exception of any of the things, nor a distinction between them. A distinction is, however, asserted, and the provision is confined to the instruments transferring "franchises," as distinguished from the instruments transferring "rights and privileges," and is denied all application to the "contracts, stipulations, licenses and undertakings" between the companies and the city. In what way is this done and with what consequences?

It will be observed that the provision does not simply confirm or ratify either the acts or deeds of transfer or the contracts; it does more. It continues them in force and makes them valid and effectual for the life of the act, the conceded equivalent of the life of the corporations. The provision is not, therefore, that the contracts and privileges obtained from the city shall "stand as made," but shall be continued in force during the life of the corporations—a distinctly different purpose, one which the words of the act sustain and at the same time exclude the other. It was not a provision for simple rat-

ification which would carry by necessary force the time limits of the contracts, but one which adopts another measure of time, the life of the corporations. And a provision was neces-, sary. to make the new measure of time applicable to the contracts. It was afforded, and again the necessity is demonstrated of adhering to the words of the act, unless we may regard it a mistake in the act for any of its words to have a purpose.

Plainly, therefore, the phrase "during the life hereof" cannot be limited to the acts or deeds of transfer of franchises. To do so is not only to distinguish between the instruments of transfer of franchises and the instruments of transfer of rights and privileges, but is to detach the phrase and its correlated words from its immediate objects, the "contracts, stipulations, licenses and undertakings" entered into by the common council and the companies, and to leave those objects without provision —without connection with anything, coherence or purpose. Against this all the rules of interpretation protest, and the rules of construction cannot be invoked to justify a greater liberty. The purpose of construction, it is true, is to arrive at conclusions beyond the absolute sense of the text. Lieber, Hermeneutics, 53. But the integrity of the text cannot be disregarded. I do not overlook the fact that the court sees an inconsistency between the parts of section two and attempts to reconcile them. But in what way? As it seems to me, by magnifying the obscure in one part of the section and making it prevail over the manifestly clear in another part. By making the words "terms and conditions" doubtful necessarily, and which, as I think, can only by an extreme indulgence be given the meaning put upon them, dominate everything else, even to the breaking of the section into unrelated and meaningless parts. To my mind a strange situation is presented. The legislature of the State had in its mind, we are told, a simple purpose—the purpose to create corporations and to give them power to acquire rights from the city; and how did they express the purpose—simply, directly and obviously? No; but in such way that the words

it employed confused or opposed the purpose. And the legislature was dealing with important rights, some to be confined to twenty-five years, others to be extended to ninety-nine years; and we are asked to believe that it bunched those rights indiscriminately and trusted to a searching construction to sort them afterwards and take them out of the meaning of words which included them all.

There is another consideration of potent weight. The construction of the court was not the contemporary construction of the act of 1865. It was not the construction proclaimed by the Governor, justifying his veto of the act. He pointed out that the necessary effect of extending the lives of the corporations was to extend their rights in the streets of the city, and that he had received petitions signed by a large number of the citizens of Chicago, protesting against the measure as one which had been passed without their assent, or that of the corporate authorities, and that it extended the franchise for ninety-nine years in advance of the term already vested in the corporation.' And he also pointed out that the right given to the city to purchase the railway property at the end of twenty-five years, secured to it by the ordinance of August 16, 1858, was also extended to ninety-nine years. And upon a fair construction the Governor said, "the act seems hardly susceptible of any other meaning," "and he had heard," he further said, "none other claimed for it." The Governor also considered the clause which continued in force the acts or deeds of transfer, and, so far as his words indicate, he perceived no difference between the instruments of transfer.

Seldom has a statute enacted at a distant time received so clear and influential proclamation of its meaning and effect as is afforded of the act of 1865, by the Governor's message. It seems now, forty years removed from the enactment of the law, that the Governor, who was close to its enactment, and the citizens of Chicago who protested against it, were mistaken in its meaning. And the Governor was part of the lawmaking power. It was his duty, therefore, to study the statute and

to try to know its purpose, not only from its text but from external circumstances. His misunderstanding needs to be accounted for.' The misunderstanding of the protesting citizens of Chicago needs to be accounted for. Explanation cannot be found by asserting ambiguities in the act. There is not a syllable of evidence to indicate that any were perceived or regarded of consequence. The Governor was confident in his views. Of one of the effects of the act, and one which could not result unless his construction was correct, he said he had heard no other claimed for it than that which he entertained and expressed. There was no doubt with him, therefore, no disguise of the measure by its advocates. We are, however, now asked to believe that the legislature alone either saw or was persuaded of the real merits of the measure, and passed it over a groundless veto and ignorant opposition, with consciousness that it would be construed to have the meaning now given it. I am unable to so believe and am constrained to dissent from the judgment.